Vincent MAGLAYA,
Petitioner-Appellant,

v.

Raymond J. BUCHKOE, Warden,
Respondent-Appellee.

No. 73–2073.

United States Court of Appeals,
Sixth Circuit.

April 21, 1975.

266

Vincent Maglaya, pro se.

Frank J. Kelley, Atty. Gen. of Michigan, Robert A. Derengoski, Sol. Gen., Thomas A. Carlson, Asst. Atty. Gen., for respondent-appellee.

Before McCREE, LIVELY and ENGEL, Circuit Judges.

ENGEL, Circuit Judge.

This is an appeal from denial by the district court without an evidentiary hearing of appellant Vincent Maglaya's petition for writ of habeas corpus, filed under 28 U.S.C. § 2254. The petition, as filed in the district court, alleged eight grounds for relief from Maglaya's conviction by a Detroit Recorder's Court jury of armed robbery of a Kroger Store on May 23, 1966.[1] We affirm.

Maglaya's principal contentions relate to the credibility of one Patrick Logan who testified for the prosecution at the trial. It is acknowledged that Maglaya's conviction was almost completely dependent upon Logan's testimony and consequently his credibility. The actual robbery itself was carried out by Logan and thus eyewitnesses to the holdup could not identify Maglaya. According to Logan, Maglaya's role in the robbery, had included planning it, furnishing the robbery note and gun, driving Logan and McGath to the vicinity of the store, assisting Logan in his getaway, and finally sharing the proceeds.

Logan had been confined in a state mental hospital from January 1963 to July 1965 when he was released on convalescent status. About four months later, after having been given a psychiatric examination, he was certified as competent and completely discharged.

On September 2, 1966 Logan turned himself in to the police and confessed to involvement in a number of crimes. His confession implicated Maglaya and one Ross McGath in the May 23, 1966 armed

1. Maglaya raised the following issues in his petition to the district court below:

*Issue # 1.*
Did the trial court deny defendant a fair trial/due process by withholding from defense information which the same court had ordered from its own psychiatric clinic when the said person's credibility was involved?

*Issue # 2.*
Did the state violate due process by failure to disclose that information that Logan was an unreliable witness?

*Issue # 3.*
Was witness Logan's testimony procured by an open or implied promise of leniency at his own sentencing?

*Issue # 4.*
Was witness Logan's testimony so unreliable that it should have been stricken?

*Issue # 5.*
Did the trial court err in the failure to instruct the jury that Logan's testimony re-

garding the planning of other holdups with these accomplices (T. 212) was limited in its relevance?

*Issue # 6.*
Did the prosecutor commit prejudicial error when he elicited testimony that a gun with five bullets was found in a studio where defendant Maglaya was working at the time of his arrest?

*Issue # 7.*
Was defendant denied effective assistance of counsel when counsel was forced to trial over defendant's objection with insufficient time to prepare for trial?

*Issue # 8.*
Was the defendant denied due process of law, the equal protection of the laws when he received a sentence of 25–40 years and the actual perpetrator of the crime received a five year probation?

Issues number 5 and 6 have not been raised by appellant's brief on appeal to this court.

robbery involved here, and as well involved Maglaya and one Reece Hayes in the armed robbery of a Food Giant Supermarket in Detroit on April 1, 1966. In consequence of Logan's confession, Maglaya was arrested for both robberies. On December 16, 1966 a preliminary examination was held in both cases, resulting in Maglaya's being bound over for trial on both armed robbery charges. On May 12, 1967 a Detroit Recorder's Court jury found Maglaya guilty of the April 1, 1966 robbery and his conviction was affirmed by the Michigan Court of Appeals in People v. Maglaya, 17 Mich. App. 379, 169 N.W.2d 530. Maglaya's jury trial on the May 23, 1966 robbery commenced in Recorder's Court on October 26, 1967 and resulted in his conviction, and a sentence of not less than 25 years nor more than 40 years by then Recorder's Court Judge Robert E. De-Mascio. This conviction was affirmed by the Michigan Court of Appeals, People v. McGath and Maglaya, 31 Mich.App. 351, 187 N.W. 904 (1971). Leave to appeal to the Michigan Supreme Court was denied.

Prior to the preliminary examination on December 16, 1966 before examining magistrate Daniel J. Van Antwerp, Maglaya made a motion for the appointment of a sanity commission to examine Logan. This was denied by Judge Van Antwerp since Logan had already been examined by a Recorder's Court Psychiatric Clinic in connection with a charge on which he was then awaiting sentence. Judge Van Antwerp also denied a defense motion to produce the Psychiatric Clinic's files on Logan. It is the denial by the magistrate of Recorder's Court clinic records relating to Logan's mental condition which Maglaya claims constitutes a denial of due process under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and subsequent cases. In Brady, it was held that "the suppression by the prosecution of evidence favorable to the accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87, 83 S.Ct. at 1197.

Viewed in the light most favorable to the appellant, a careful review of the record confirms the district court's finding that although the existence of the medical reports was known to Maglaya and his counsel, no effort was made to subpoena them in the trial of the May 23 robbery. Maglaya seeks to justify his failure to subpoena the records and witnesses on the basis that the effort would have been futile in view of his earlier experience in the trial of the April 1 robbery. While we do not have the record of that trial, it is apparent from references to it in Maglaya's brief that at the earlier trial he had subpoenaed six witnesses who were either psychologists or psychiatrists, including those who participated in the examination of Logan at the Recorder's Court Clinic.

In post-conviction proceedings in the Recorder's Court, two of the requested reports were ultimately produced. The June 3, 1966 report of psychiatrist Aloysius S. Church stated in part:

"Psychiatric Evaluation

This individual reveals emotional instability with passive-aggressive and compulsive features. There is evidence of paranoid trends. There is a history of a suicidal attempt.

Recommendation:

We recommend a period of institutionalization, to be followed by supervision."

The report of psychiatrist Roger T. Costello, prepared for Recorder's Judge John A. Ricca on October 10, 1966, provided:

"The patient resumed (after leaving the Detroit House of Correction in July) the commission of robberies with a loaded gun. From the Chatham Supermarket alone, the two men and one woman handed over $2200. The patient allegedly split with a buddy and used the balance to buy items for his wife including a hi-fi and French poodle.

The patient has a sociopathic personality disturbance with underlying schizophrenia. He is egocentric, unreliable and undependable.

We would recommend a maximum period of institutionalization."

The Recorder's Court Clinic was established under the authority of Michigan Public Act No. 369 of 1919, § 3, M.C.L.A. 725.3 which grants the court "power to make provision for a psychopathic department of the court and have medical and psychopathic investigations and examinations and treatment of persons coming before said court . . . . " Appellant claims that he was entitled, as a matter of Michigan law, to access to the records concerning Logan to assist him in his defense at the trial, relying upon People v. Saccoia, 268 Mich. 132, 255 N.W. 738 (1934) where it was stated:

"The psychopathic department of the court is a part of the court. Its reports are public reports, authorized by law, and the defendant had a right to have access thereto and to learn their contents." 255 N.W. at 740.

Other than to note that in People v. Saccoia, supra, the issue was the defendant's right to access to his own psychiatric records for use in his defense against a murder charge, we do not find it necessary to decide here whether, as to Maglaya, Logan's psychiatric records were properly declared confidential or privileged or were otherwise properly denied under Michigan law.

▆▆▆ So far as the record in the state proceedings which led to Maglaya's conviction of the May 23, 1966 robbery, there is no further indication that after the denial of the request during the preliminary examination stage, Maglaya ever again sought to have this information produced. Indeed he does not even make such a claim. Instead, he claims that the unavailing efforts of his counsel to have such information produced at his earlier trial for the April 1, 1966 robbery demonstrate the futility of seeking it in the trial involved here, and thus excused

his further efforts. In essence, he argues that the asserted error of the trial court in his trial of the earlier robbery can be raised in a federal court collateral attack upon the validity of an entirely distinct trial involved an entirely separate offense. We find this claim to be completely untenable. At issue here is whether the appellant's constitutional rights to due process and the fundamental fairness implicit therein were denied him in the trial and conviction involved here. We find they were not.

A careful examination of the state court record is convincing that Maglaya's claims are substantially overstated. Contrary to appellant's assertion, no effort to deceive either Maglaya or the jury concerning Logan's background and credibility was made out. On its own initiative, the prosecution brought out at the trial that Logan had previously been institutionalized at Ionia State Hospital and had been released on July 6, 1965; that he had been certified as mentally competent and had had his rights of citizenship restored on February 26, 1966. Admissibility of evidence in a state trial does not normally raise constitutional questions unless it impugns fundamental fairness, Gemmel v. Buchkoe, 358 F.2d 338 (6th Cir. 1966), cert. denied, 385 U.S. 962, 87 S.Ct. 402, 17 L.Ed.2d 306, reh. denied, 385 U.S. 1021, 87 S.Ct. 723, 17 L.Ed.2d 561; Burks v. Egeler, 508 F.2d 672, 6th Cir. Further, we are shown no authority which holds that the denial of discovery at the preliminary examination stage of criminal proceedings rises to the level of a constitutional deprivation. Indeed, we have held in this circuit that there is no constitutional right to a preliminary hearing at all. Dillard v. Bomar, 342 F.2d 789 (6th Cir. 1965). Even assuming the highly doubtful proposition that the evidence sought was admissible, the rights protected under Brady v. Maryland, supra, are not violated when a defendant in a criminal trial has full knowledge of the existence of the evidence prior to trial and makes no effort to obtain its production. In addition, we note that the facts concerning Logan's

prior mental history were exhaustively covered at the trial.

■ Closely akin to the *Brady* issue is the claim that the prosecution knowingly permitted Logan to testify falsely at the trial in violation of Maglaya's right to due process as protected under Mooney v. Holohan, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935), and subsequent cases. Using his own words, Maglaya claims that "the prosecutor portrayed his witness as a man being sane, had no psychiatric treatment, whereas, the record established at the time prosecutor so portrayed his witness thus, he knew that two psychiatrists had declared Logan to be insane, a man suffering from various types of psychopathic disabilities, a man termed a psychopathic liar and recommended for long commitment to a mental institution for the insane".

As did the district court, we find this latter contention to be without merit. The record shows that at the trial, the prosecution presented Logan to the jury as he was. It made no effort to hide his past criminal record, nor his history of mental illness. That Logan was in fact discharged from the Ionia State Hospital and determined competent by the probate court, as testified to by him, is not disputed. Appellant's assertion that the two psychiatrists had determined Logan to be insane and recommended long commitment to a mental institution for the insane is at best an overstatement of the reports of Doctors Costello and Church. Since the reports were rendered in response to a referral by the Recorder's Court Judge in connection with the sentencing of Logan, we understand the recommendation to refer to long confinement in a penal rather than a mental institution. Such a recommendation, aside from being essentially a conclusory opinion, is hardly the type of evidence which an alleged confederate would want before the jury. Logan testified at length to his history of mental illness and the issue was exhaustively presented to the jury. In short, appellant has wholly failed to show where in fact the government permitted Logan to testify falsely at the trial.

■ We find it necessary to discuss only one further asserted ground for appeal, Maglaya's claim that he was denied the effective assistance of counsel. This issue is fully and satisfactorily covered in the decision of the Michigan Court of Appeals and would ordinarily suffice to dispose of the issue. However, the district court in its opinion cited the "farce and mockery of justice [rule]" of Hayes v. Russell, 405 F.2d 859 (6th Cir. 1969), a standard which we have since rejected in favor of holding that "the assistance of counsel required under the Sixth Amendment is counsel reasonably likely to render and rendering reasonably effective assistance". Beasley v. United States, 491 F.2d 687, 696 (6th Cir. 1974). Not only does our own review of the record satisfy us that the conduct of Maglaya's counsel met the proper standard of *Beasley,* but we note as well that in passing upon the same issue, the Michigan courts did not in any event rely upon a "farce and mockery" or other improper standard. Under such circumstances, remand is unnecessary. Berry v. Cowan, 497 F.2d 1274 (6th Cir. 1974).

The remaining issues raised on appeal, and as well those two raised in the district court but not here, we find to be without merit for the reasons stated in the opinion of Chief District Judge Noel P. Fox in his opinion and order dated March 13, 1973.

Accordingly, the judgment of the district court is affirmed.

McCREE, Circuit Judge (dissenting).

I respectfully dissent. This appeal presents a serious question whether appellant received a fair trial as guaranteed by the Fourteenth Amendment. Unfortunately, the difficulty of resolving this question is increased because appellant is not represented by counsel on appeal and because we did not have the benefit of oral argument.

The majority opinion denies relief by charging Maglaya with the failure of his

appointed counsel to request disclosure by the state of information critical to the defense. I agree that although a lawyer's error is generally chargeable to his client, nevertheless, in this instance, I think that counsel's dereliction may have deprived Maglaya of the effective assistance of counsel—a right guaranteed by the Constitution.

The prosecution's evidence of appellant's involvement in the robbery consisted almost entirely of the testimony of Patrick Logan who had surrendered to the police and had confessed his guilt to this offense and to several other crimes. Logan was the only person whom eyewitnesses saw participating in the crime.

Since appellant could not have been convicted unless Logan's testimony were credited, any failure by counsel to obtain access to significant evidence useful in impeaching him becomes important. It is undisputed that Logan had been released from a mental institution only a few weeks before the first of several robberies to which he confessed, and, although he had been certified as sane and restored to the rights of citizenship a few months before the robbery in this case, he still experienced severe mental disorders. The severity of these disorders was manifested by several suicide attempts culminating in the taking of his life after the trial.

At a state post-conviction hearing, it was disclosed that two psychiatric opinions based on pretrial examinations of Logan reported:

This individual reveals emotional instability with passive-aggressive and impulsive features. There is evidence of paranoid trends. There is a history of a suicidal attempt.

We recommend a period of institutionalization, to be followed by supervision.

and

The patient has a sociopathic personality disturbance with underlying schizophrenia. He is egocentric, *unreliable and undependable.* (Emphasis added).

We recommend a maximum period of institutionalization.

Although these reports were available and were requested before trial, they were not furnished to Maglaya's counsel. The record suggests that there may be other expert opinion about Logan's mental condition but we are unaware of what it might disclose about his mental state, including his ability to tell the truth. Nevertheless, the conclusions of the two psychiatrists quoted, if believed by a jury, would have seriously undermined Logan's credibility.

Appellant was charged with two robberies, to which Logan confessed and it appears that a single preliminary hearing was conducted with respect to both offenses. At this preliminary hearing, appellant's counsel (who was not trial counsel in the case before us) moved for the production of psychiatric reports on Logan and for appointment of a sanity commission to examine him. The motions were denied. At the trial on one of the charges, counsel (who apparently did not represent appellant either at the preliminary hearing or at the trial under review) moved to exclude Logan's testimony as incompetent. The motion was denied.

During the trial of the offense that we consider here, counsel made no motion to exclude Logan's testimony or for the production of psychiatric reports. He did not subpoena the psychiatrists who had examined Logan. His failure to do so may have been critical, for as the trial court observed, "The case is entirely dependent upon the testimony of the witness Pat Logan," and as the state conceded, "The whole nub of the case, crux of the case, is do they [the jury] believe Logan or don't they." That the credibility of Logan was critical is underscored by the fact that appellant presented an alibi defense and his witnesses testified that he was with them at the time Logan accused him of participating in the robbery.

Moreover, contrary to the assertion in the majority opinion, the government did

not fully and fairly present "Logan as he was" to the jury. Instead, the record on appeal persuades me that the state deliberately conveyed to the jury the impression that Logan had recovered from his mental disorder and had been well since the time he had been declared competent. It created this impression even though it had in its possession evidence indicating that Logan was still a seriously disturbed person. The following examination of Logan by the state illustrates the tactic employed:

Q. Now, what date were you released from Ionia?

A. I was released July 6, 1965.

Q. July 6, 1965?

A. Yes, sir.

Q. What date were you certified by Probate Court as being sane and having your rights as a citizen restored?

A. February 26, 1966.

Q. February, 1966. What was the date of this holdup?

A. This holdup? May 23rd.

Q. Have you been in any institution since May, mental institution?

A. No, sir, I have not.

Q. Have you been examined by psychiatrists?

A. Yes, sir.

Q. Examined by Recorder's Court Clinic?

A. Yes.

Q. Anyone send you to any institution?

A. No, sir.

Q. Have you received a psychiatric treatment whatsoever since July 6, 1965; treatment?

A. No treatment at all, no, sir.

Q. So that at the time this holdup was committed on May 23, 1966, you had been certified as completely sane for about ten months anyway, right?

A. Yes.

Moreover, the state's summary question and Logan's answer told the jury that Logan had been certified as sane for ten months before the robbery when, in fact, he had been so certified for only three months.

I do not decide, as the majority opinion also does not, whether the Recorder's Court Clinic reports of Logan's mental disorder would have been admissible. However, I observe that the Michigan Court of Appeals in People v. McGath & People v. Maglaya, 31 Mich.App. 351, 356, 187 N.W.2d 904, 905 (1971) indicated that this evidence would have been subject to subpoena by defense counsel and would have been admissible at trial:

Thus, the fact that Logan had mental problems and had been examined by the Clinic was known to Maglaya's counsel as early as December 6, 1966. The People did in fact disclose the existence of the Recorder's Court files. . . . The defense knew about these reports but didn't subpoena the doctors for the purpose of offering the reports in evidence in this case. The reports and witnesses were subject to subpoena and so there is no basis for a claim that the People suppressed such evidence, it not being in the People's exclusive possession and it being reachable by the defendants.

In determining whether appellant was denied the effective assistance of counsel, I assume that the medical evidence would have been admitted had defense counsel subpoenaed it and consider whether the conduct of counsel amounted to reasonably effective assistance. Beasley v. United States, 491 F.2d 687 (6th Cir. 1974). In that case, where we reversed because "[p]otentially exonerating defenses were not explored by counsel and were not developed at trial," we explained the Constitutional requirement in this way:

Defense counsel must perform at least as well as a lawyer with ordinary training and skill in the criminal law and must conscientiously protect his client's interest, undeflected by conflicting considerations. [Citations omitted].

Defense counsel must investigate all apparently substantial defenses available to the defendant and must assert them in a proper and timely manner. [Citations omitted].

491 F.2d at 696.

Here, counsel failed to request the production of reports and to procure the testimony of examining psychiatrists about the mental condition of the crucial prosecution witness. His duty to have made the request is indisputable because there was a substantial likelihood that this evidence would have revealed that the witness was seriously disturbed. His failure to have done so cannot be dismissed as a trial tactic. The record shows that his failure to make the request was probably because of his lack of familiarity with the case he had agreed to defend. Counsel's lack of preparation is revealed by the following conversation that took place among Maglaya, his counsel, and the trial court on Wednesday, October 25, the first day of trial:

DEFENDANT MAGLAYA: Your Honor, I am not ready to go to trial. I have only had this man two days and he has seen me only a total of forty-five minutes. He doesn't know anything about the case.

THE COURT: Step forward. What is it?

DEFENDANT MAGLAYA: I have only seen him maybe a total of forty-five minutes in two visits. He doesn't know anything about me or the case.

[Defense counsel] MR. FERGUSON: This situation has been subsequently tangled up. First Mr. Goldfarb was on the case, and then Mr. Koscinski, and then Mr. Gillis and Mr. Schudlich, who I am with today.

THE COURT: You are in Mr. Schudlich's office?

MR. FERGUSON: Yes. I have acquaintance with the case. But if the man is unhappy, I suggest that we adjourn here until we can do something about it.

THE COURT: I am not going to be appointing him counsel just at the flip of a hat.

MR. FERGUSON: I don't expect you to.

DEFENDANT MAGLAYA: I came down from Jackson Thursday and he came to see me once for a half hour since then, and once for ten minutes yesterday. That is all.

THE COURT: Did your office prepare the case?

MR. FERGUSON: Yes.

THE COURT: *Then you are ready for trial?*

MR. FERGUSON: *I could be ready for trial.* But if the man is unhappy—[Emphasis added.]

&ast; &ast; &ast; &ast; &ast; &ast;

THE COURT: . . . You have a notice of alibi filed here. Have you interviewed the alibi witnesses?

MR. FERGUSON: I haven't had a chance to interview them. *I just found out about the alibi Monday,* Your Honor. [Emphasis added.]

[Asst. Pros. Attorney] MR. WEISWASSER: Whatever reasonable time counsel wants, I have no objections to giving him an opportunity so he may consult with the witnesses. I don't know what particularly detailed interview he would have to have, considering the fact that they are merely going to testify to where the defendant was at a given time and a given place.

THE COURT: How many days will it take for the People's case?

MR. WEISWASSER: I don't think it should take more than a couple of days at the most.

THE COURT: Could, you, between now and two days, interview these witnesses?

MR. FERGUSON: Certainly, Your Honor.

THE COURT: Are they under subpoena?

MR. FERGUSON: They are not under subpoena as far as I know, but I will subpoena them.

\* \* \* \* \* \*

MR. WEISWASSER: The original notice of alibi. If you will look at the date of that, it was filed a long time ago.

DEFENDANT MAGLAYA: That was five different attorneys and this attorney is not aware of it.

THE COURT: That statement is correct. The notice of alibi was filed last July sometime. But Mr. Ferguson made a statement that he was unaware of the notice of alibi until last Monday.

MR. WIESWASSER: By the defendant's own statement, he was interviewed by Mr. Ferguson a couple of times. And if there was any need to apprise Mr. Ferguson of the alibi for investigative purposes, a good time to have done it was when he interviewed Mr. Maglaya.

MR. FERGUSON: I interviewed Mr. Maglaya with Judge Gillis a couple of months ago and then Monday and Tuesday.

THE COURT: Of this week?

MR. FERGUSON: I spent almost an hour—

THE COURT: This week?

MR. FERGUSON: Yes.

DEFENDANT MAGLAYA: That was when Judge Gillis said he couldn't take my case.

THE COURT: Then he went into the facts with you then, did he not?

DEFENDANT MAGLAYA: No. He said he had to hurry—

\* \* \* \* \* \*

[Counsel for co-defendant McGath]. MR. HUBBELL: I would say [that it will take me] two, three hours [to put in my case].

THE COURT: Well, a half a day?

MR. HUBBELL: Yes.

THE COURT: Well, Mr. Maglaya, that is two and a half days before you even have to start to do anything. I am sure in the interim your attorney can amply cross examine the witnesses. You indicated that you have read the facts?

MR. FERGUSON: Yes.

THE COURT: And you read the police report and all the information?

MR. FERGUSON: *I just read the police report* and I have talked to Mr. MacLain. [Emphasis added.]

THE COURT: And he has two and a half days yet. Then plus the entire week end. I might say to you that you will have more time because he will have the entire week end, including Friday, because we cannot sit and hear this case on Friday for the reason that the Court has to attend a judicial conference. So don't you agree that he would have sufficient time to perfect the alibi? That is your defense, isn't it, alibi?

DEFENDANT MAGLAYA: Yes.

THE COURT: So, it seems to the Court that he has sufficient time to perfect that. . . .

\* \* \* \* \* \*

DEFENDANT MAGLAYA: I want him to file some motions for me and he doesn't know anything about them.

THE COURT: What type of motions?

DEFENDANT MAGLAYA: Attacking the validity of the complaint and warrant. I have been incarcerated since 1966, November. I think I should have been brought to trial long before this.

\* \* \* \* \* \*

DEFENDANT MAGLAYA: I think I should have the opportunity to have effective counsel by being able to find out the prosecution's diagrams and statements and so forth.

THE COURT: Pardon me.

DEFENDANT MAGLAYA: I should at least be afforded the effec-

tiveness of what a counsel is supposed to do to defend me, and I don't think that he has had the opportunity to do this.

\* \* \* \* \* \*

THE COURT: We will draw the jury today and give you all afternoon. But you have had advantage of an examination in this case.

MR. FERGUSON: I was not on the examination.

THE COURT: But the transcript is here. You will have the transcript and whatever the police have to give you.

MR. WEISWASSER: The People will make available to counsel the transcript, the reports of the police, and anything at all that we have of a documentary nature.

THE COURT: Don't you agree that will be to your advantage to do that? If he did these things a month ago he would still have to do it again today in order to make sure he has it fresh in his mind. Are you satisfied with that arrangement?

DEFENDANT MAGLAYA: I am not really because I don't think it affords him the opportunity to research for questions that might come up.

THE COURT: Of law?

DEFENDANT MAGLAYA: Yes.

THE COURT: I am afraid that you are going to find that Mr. Ferguson is well abreast of his law.

DEFENDANT MAGLAYA: I am sure he is but I am sure he doesn't have all of it in his mind. All I want is a fair trial.

\* \* \* \* \* \*

DEFENDANT MAGLAYA: Your Honor, may I say one more thing? I would like to discharge my attorney because I don't think he can defend me.

\* \* \* \* \* \*

DEFENDANT MAGLAYA: I only want somebody who has had ample opportunity to investigate the case.

THE COURT: He indicated that he has done that, which he can do thus far, and with the Court's plan for proceeding with this trial, he indicated that he has had sufficient time to do what he has to do by way of remaining investigation.

So, we are proceeding and that is your attorney. Bring in the jury.

The record discloses that the jury was empanelled and sworn, that the case was then continued and that appellant and his counsel met from 11:45 a. m. to 12:10 p. m., or a total of 25 minutes.

On the next day, October 26, when trial resumed, appellant once again sought to address the court but the judge told him that whatever he had to discuss could wait. The trial then proceeded, and the government made its opening statement. Following its presentation, counsel for appellant made the following opening statement which I quote in its entirety:

On behalf of the defendant Maglaya, ladies and gentlemen of the jury, I request that you bring in a proper verdict and *particularly based upon the testimony of this Mr. Logan.* That is all at this time, ladies and gentlemen of the jury. [Emphasis added.]

Needless to say, this statement was exactly contrary to appellant's position and, appellant in his brief states that he was upset by it and immediately expressed his concern to counsel. Counsel purportedly apologized and then stated, *"I thought Logan was for you."* Closing argument was waived.

Moreover, the alibi witnesses were never subpoenaed. Three persons appeared voluntarily and testified but one could not say with certainty that appellant was with him at the critical time. It is not inconsequential that the three other defense witnesses did not testify because counsel for appellant in his voir dire of the jury stated that six witnesses would establish that appellant was with

them at the time of the robbery and mentioned them by name. It is not un-likely that the jury drew inferences unfavorable to appellant because they did not testify.

As the majority opinion observes, the district court applied the "farce and mockery" test in determining that appellant's right to effective representation by counsel was not abridged.

Section 2254(d) of Title 28 provides in relevant part:

> In any proceeding instituted in a Federal court by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination after a hearing on the merits of a factual issue, made by a State court of competent jurisdiction in a proceeding to which the applicant for the writ and the State or an officer or agent thereof were parties, evidenced by a written finding, written opinion, or other reliable and adequate written indicia, shall be presumed to be correct, unless the applicant shall establish or it shall otherwise appear, or the respondent shall admit—
>
> .    .     .     .      .
>
> (2) that the factfinding procedure employed by the State court was not adequate to afford a full and fair hearing;
> (3) that the material facts were not adequately developed at the State court hearing; [or]   .    .    .
> (6) that the applicant did not receive a full, fair, and adequate hearing in the State court proceeding   .   . ..

I am not satisfied that the trial transcript and the state post-conviction proceedings afforded the district court a sufficient record to permit it to determine whether appellant was afforded effective assistance of counsel. Perhaps because the district court applied the discredited "farce and mockery" test, it did not believe that an evidentiary hearing was required. I would hold that under the *Beasley* test an evidentiary hearing

should have been conducted. I would reverse and remand for an evidentiary hearing and for a determination applying the principles of *Beasley.*