Andrew Lee WAGSTER,
Petitioner-Appellee,

v.

Roger T. OVERBERG,
Respondent-Appellant.

No. 76-2506.

United States Court of Appeals,
Sixth Circuit.

Argued April 5, 1977.

Decided Aug. 12, 1977.

William J. Brown, Atty. Gen. of Ohio, Allen P. Adler, Columbus, Ohio, for respondent-appellant.

Hugh D. Holbrock, Timothy R. Evans, Holbrock, Jonson, Bressler & Houser, Ham-

ilton, Ohio, Andrew Lee Wagster, pro se, for petitioner-appellee.

Before WEICK, EDWARDS and ENGEL, Circuit Judges.

WEICK, Circuit Judge.

The State of Ohio has appealed from an order of the District Court granting a writ of habeas corpus to the petitioner, Andrew Lee Wagster.

Wagster was convicted on January 15, 1970 by a jury in the Court of Common Pleas of Butler County, Ohio of murder in the second degree. He was sentenced to life imprisonment. His conviction was affirmed on direct appeal to the Court of Appeals for the First Appellate District of Ohio, and his appeal to the Supreme Court of Ohio was dismissed sua sponte for lack of a substantial constitutional question. Wagster then filed a petition for writ of habeas corpus with the United States District Court for the Southern District of Ohio, Eastern Division, alleging, for the first time, violation of his constitutional rights by suppression of exculpatory evidence. The petition was denied for failure to exhaust his state remedy of delayed appeal. Thereafter petitioner's motion for a delayed appeal was overruled by the Court of Appeals for the First Appellate District of Ohio, and a similar motion was overruled by the Supreme Court of Ohio.

On January 6, 1976 Wagster filed a second petition for a writ of habeas corpus with the United States District Court for the Southern District of Ohio, Eastern Division, alleging that he was deprived of his constitutional rights by:

(a) Suppression of exculpatory evidence by the prosecution and refusal of the judge to grant defendant's motion for exculpatory evidence.

(b) The refusal of the trial court to suppress illegally seized evidence.

After an evidentiary hearing was held in the District Court concerning the factual

issues raised by the petition and the return of the writ, the Court rendered an opinion and entered an order granting the writ. The Court rejected petitioner's Fourth Amendment contention with respect to suppression of illegally seized evidence, but held that petitioner had sustained his burden of proof with respect to his remaining contention that the failure of the prosecutor to reveal to defense counsel the pretrial statement given to the Hamilton, Ohio police by one Pauline Williams, constituted the suppression of exculpatory evidence and denied petitioner a fair trial. The sole issue before us on this appeal is whether petitioner was denied a fair trial because the prosecutor did not furnish to the defense counsel the pre-trial statement of Pauline Williams. We disagree with the conclusion of the District Court that petitioner sustained his burden of proof on this issue, and we reverse.

After the jury was empaneled and before any testimony was taken at petitioner's trial in the Court of Common Pleas of Butler County, the following colloquy took place among defense counsel, the prosecutor, and the trial court:

*Mr. Signer* [Defense counsel]: At this time, in behalf of the defendant, we would like to make a Motion to require the prosecution to produce all evidence and testimony in his possession which may be favorable to the defendant; in particular, we would like to have the results of all forensic tests, ballistics tests, fingerprint tests, blood tests—that being tests of the blood of the decedent. We should also like to have copies of any statements made by any person to the prosecution whom the defense will call as their witnesses in chief, and who we have been informed the prosecution shall also call in chief.

*Mr. Wessel* [Prosecutor]: If the Court please, and on the basis of a case recently decided by this Court—not by this Judge—in the State vs. Latham, I would ask the Court to deny defendant's Motion on the basis that any statement from a witness the police have obtained and submitted to me, any forensic test performed by any technician or doctor, is a "work Product" and as such, is privileged, and therefore not within the purview of discovery as indicated by the defendant.

*By the Court:* I am going to overrule your Motion. However, I am going to order that the Prosecutor give to you, prior to introduction and for purposes of Cross-Examination, any statements or copies of statements that he may have that a witness has given. For purposes of Cross-Examination, he will be required to furnish you a copy of whatever he has.

Shortly thereafter the first witness was called. The pertinent testimony at the trial is accurately summarized by the District Court as follows:

The only witness called by the prosecution who was present at the Wayside Inn on the night of the shooting was Barbara Fagg. She testified that Wagster was seated at a table with four or five others near a jukebox at the rear of the bar. Fagg was standing alongside the bar next to her husband, who was seated on a barstool. Roy Louis Haag was sitting on a barstool near the front of the bar; she saw him go to the rear of the bar, stand at the Wagster table, and converse with those seated there. The jukebox was playing, and she did not hear any conversation. She did not see or hear any altercation in the bar. She did not see Haag return to the barstool, but when she heard three shots fired, she turned and saw Haag falling off the barstool at the front of the bar. She then saw Wagster walking from the front of the bar to the rear with a gun in his hand. She saw nothing in Haag's hands as he fell. . . . She testified that when the shots were fired, she was "[f]acing toward the jukebox, and the shots came from behind me."

Carl Burton, an ambulance attendant, testified that when he arrived at the Wayside Inn Haag was lying in a pool of blood right next to the front door. Dr. Garret J. Boone, Butler County Coroner, testified that he conducted a preliminary examination of Haag's body, and that at that time he removed from one of his

pockets "a small pocket knife with a blade about two and a half inches long— there were two blades." He further testified that he was present when an autopsy was performed on the body. Haag was hit by two bullets, both entering on the left side of his body and traversing toward the right side. The bullet which caused death entered at the upper left side of the body, at the mid-auxiliary line, and punctured both lungs. The other bullet entered about nine inches lower and crossed the middle of the abdomen.

Detective James C. Thomas testified that on the day following the shooting he went to the Wayside Inn to look for a spent bullet, and found it under the round table near the jukebox at the rear of the bar. The floor of the bar was freshly mopped and still wet.

Steve Molonar, a ballistics expert, testified that a bullet found in Haag's body, and the one found in the bar by Detective Thomas, were fired from a Smith and Wesson 32 calibre revolver found by Patrolman Robert Herd in an alley outside the Wayside Inn on the night of the shooting. He also testified, based upon his examination of the gun powder burns near the entry holes of Haag's shirt, that the gun was touching the shirt when one shot was fired, and between one and three feet away from it when the other shot was fired.

This, in essence, was the prosecution's case-in-chief. After a motion for judgment of acquittal was overruled, petitioner took the stand in his own behalf.

Wagster testified that he had never met Haag before, but that Haag came back to the table by the jukebox when Wagster's nephew, Anthony Wagster, arrived. Anthony introduced Haag to petitioner, and Haag went back to the bar. Thereafter, Haag returned to the Wagster table and asked petitioner's girlfriend to dance; she declined. Haag then followed Wagster into the restroom and, according to Wagster, "called me a name." Wagster testified that he ignored Haag because Haag was physically larger than he, and he was scared of him.

After Wagster returned to his table, he testified, Haag approached him again and hit him on the side of his face with his fist, knocking him out of his chair. Wagster stood and shoved Haag away. Haag then pulled out a knife and said, "Ill kill you, you son-of-a-bitch." Wagster then fired his revolver, and Haag turned around, walked toward the front of the building, and fell. He testified that he did not shoot Haag at the front of the bar. He told the jury that he ran from the bar after the shooting because he was scared.

Anthony Wagster was called by the defense and testified that he had warned petitioner that Haag carried a knife. He also testified on direct that a fight did break out between petitioner and Haag at the table near the jukebox; on cross-examination, however, he testified that he did hear a fight, but did not see who was involved in it.

Phyllis Crank, petitioner's girlfriend, then testified. Her story corroborated petitioner's in most respects. She said Haag had been "smarting off," that he struck petitioner in the mouth and said "I'll kill you, you son-of-a-bitch." She was knocked over the jukebox and saw nothing else. She did not mention seeing a knife.

Felix Wagers, Jr., testified that he was seated "back toward the end of the bar," heard an argument and some cans rattling, and heard two shots. He heard no furniture overturned, and heard no shouts. Barbara Fagg, petitioner, and Phyllis Crank had testified that Wagers was seated at the Wagster table before the shooting.

This, in essence was the defense case. The prosecution put on no rebuttal witnesses.

Petitioner alleged in his second petition for a writ of habeas corpus in the United States District Court:

The prosecutor had in his possession the statement of a witness to the incident, one Pauline Williams, which conflicted with the testimony of the state's

chief witness, Barbara Fogg [sic]. The prosecution did not reveal the name of this witness or her testimony, although it was material to petitioner's defense.

The statement in question given by Pauline Williams to police on the night of the shooting, was as follows:

On Sat. at about 4:20 P.M. I went to work at the Wayside Inn Hotel at 512 So. 5th St., Hamilton, Ohio. At about 12:30 P.M. there was a large group of people. A man I do not know was seated on the first stool in the bar. Gettys and Barbara Fagg was also seated at the bar closer to the other end of the bar. At a table directly in front of the juke box was Andy Wagster, Tony Wagster, Phyllis Crank, Boyd Blanton, Andy's father, Janice and Felix Wagers Jr. The juke box was playing and there was a lot of noise. The man that was shot came into the bar (sic) the front door and sat at the second stool. Later he walked back and was between Andy's father and Tony Wagster, I turned to go to the register or to get some ice out of the bin, at this time I heard two shots. I turned around and the man that had been at the table between Tony and Andy's father was turning and staggering toward the front door, he started turning somewhere near the opposite end of the bar. Andy was standing about seven feet from the man when he started to stagger, the man staggered all the way to the front of the bar and fell against the man on the first stool next to the front door. Andy stayed where he was and I went past him into the kitchen I was going to call the police. I glanced back and Andy was walking toward the man that was shot. Janice Wagers called the police. I was coming out of the bedroom and I saw Andy and Phyllis walking fast out the back door. I said Oh what are we going to do. Andy said I don't care what you do I'm leaving.

At the evidentiary hearing held in the District Court on the petition for a writ of habeas corpus, Pauline Williams reaffirmed her statement that she was sure that Haag was in the back of the bar when he was shot. She testified at the hearing that she never saw a knife in Haag's hand and that she did not see the petitioner shoot Haag. Further, she admitted that she knew the petitioner before the night of the shooting at the Inn. She called him "Andy". She was also acquainted with petitioner's father who, on the night of the shooting, had asked her to go upstairs at the Inn and "get Andy". She spoke to petitioner after the shooting, asking him, "What are we going to do?"; and he said, "I don't know what you're going to do, but I'm leaving."

Because of this relationship between petitioner and his father with Pauline Williams, it is not understandable how petitioner can, in good conscience, contend that the State suppressed anything. Petitioner knew that his friend Williams was tending bar on that evening, and could easily have learned from her what she would testify to if he really wanted to call her as his witness.

It was further revealed at the hearing that Pauline Williams was subpoenaed by the prosecution and that she was paid a witness fee, but that she was never called to testify.

I

In *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the Supreme Court stated that the prosecutor's failure to disclose, upon defendant's specific request, evidence favorable to the defense constitutes a denial of due process. In *Brady* the defense counsel, prior to trial, specifically requested the prosecution to allow him to examine any extrajudicial statements made by Brady's accomplice. Although several of the extrajudicial statements were provided to defense counsel, the prosecutor withheld a statement in which the accomplice admitted that he had perpetrated the actual homicide. The Supreme Court, noting that the extrajudicial statement had been requested and that it was "material", announced the following rule at 87, 83 S.Ct. at 1196:

We now hold that the suppression by the prosecution of evidence favorable to

an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.

In *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), the Supreme Court recently elaborated on the prosecutor's duty to disclose exculpatory evidence. The Court articulated three different standards for reviewing the materiality of undisclosed information, the applicable standard dependent upon which of three types of factual situations is presented. The common thread among each of the three different situations was explained by the Court at 103, 96 S.Ct. at 2397, as follows:

> Each involves the discovery, after trial, of information which had been known to the prosecution but unknown to the defense.

The first type of factual situation is where the prosecution has employed testimony which the prosecution knew, or should have known, was perjurious. The Court noted at 103, 96 S.Ct. at 2397 that in such a situation the conviction must be reversed "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury."

The second type of situation is exemplified by the *Brady* case wherein the defense makes a specific request for certain evidence. The Court noted at 104, 96 S.Ct. at 2397 that in such a situation "implicit in the requirement of materiality is a concern that the suppressed evidence might have affected the outcome of the trial." The Court further stated at 106, 96 S.Ct. at 2398:

> When the prosecutor receives a specific and relevant request, the failure to make any response is seldom, if ever, excusable.

The third type of situation is where, as in *Agurs,* the defense has made no request for exculpatory evidence, or, as in the present case, the defense has made only a general request for exculpatory, or favorable evidence. The Supreme Court noted at 107, 96 S.Ct. at 2399 that there is "no significant difference" between a situation where there

has been a general request and one "in which there has been no request at all," and the Court indicated that in such situations only if the withheld evidence is "obviously exculpatory" is disclosure required. The Court stated at 107, 96 S.Ct. at 2399:

> If there is a duty to respond to a general request of that kind, it must derive from the obviously exculpatory character of certain evidence in the hands of the prosecutor.

The Court further explained the standard of materiality where there has been a general request or no request, stating that a denial of due process will be found only where "the omitted evidence creates a reasonable doubt" as to the defendant's guilt. The Court stated at 112–13, 96 S.Ct. at 2401:

> The proper standard of materiality must reflect our overriding concern with the justice of the finding of guilt. Such a finding is permissible only if supported by evidence establishing guilt beyond a reasonable doubt. It necessarily follows that if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed. This means that the omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt. [Footnotes omitted]

Defense counsel in the present case made only a general request, in the form of an oral motion made at trial, that the prosecution produce "all evidence and testimony in his possession which may be favorable to the defendant . . ." and "copies of any statements made by any person to the prosecution whom the defense will call as their witnesses in chief, and who we have been informed the prosecution shall also call in chief." Defense counsel did not specifically ask for the statement of Pauline Williams,

nor did he ask for the statement of any person who was present at the Wayside Inn on the night of the shooting. Moreover, the trial court overruled the motion of defense counsel but did order the prosecution to reveal "prior to introduction and for purposes of Cross-Examination, any statements or copies of statements that he may have that a witness has given. For purposes of Cross-Examination, he will be required to furnish you a copy of whatever he has." Pauline Williams, however, never appeared as a witness at trial and therefore the prosecution had no duty, pursuant to the terms of the trial court's order, to furnish to defense counsel Williams' statement.

The holding in *United States v. Agurs, supra,* makes it clear that there is a heavy burden on the petitioner in the present case to demonstrate that the failure of the prosecution to disclose the statement of Pauline Williams was a denial of due process because defense counsel made only a general request for any favorable evidence. We are of the opinion that the statement of Pauline Williams was not "obviously exculpatory" and that it did not create a "reasonable doubt" as to petitioner's guilt.

First, the statement of Pauline Williams was not "obviously exculpatory" in light of the "entire record" because Pauline Williams testified at the post-conviction hearing in District Court that she had not seen a knife in Haag's hand, and that petitioner had left the scene of the crime hurriedly. The only evidence which the prosecution could reasonably have been expected to furnish to defense counsel would have been evidence bearing on the petitioner's principal claim of self defense; but, while Pauline Williams' statement did, as the District Court noted, "create a reasonable doubt . . . concerning the exact locale of the shooting", the statement was of speculative value to the defense and clearly it did not support the claim of self defense. She did not see the shooting; she heard only the shots; she did not even witness any altercation between petitioner and the decedent. In fact, as the District Court stated:

His claim of self-defense may in fact have been illusory on this record, in view of the fact that Haag's knife was found in his pocket after his death.

Second, it cannot be said that the statement of Pauline Williams created a "reasonable doubt" as to petitioner's guilt. Pauline Williams never indicated in her pretrial statement or at the evidentiary hearing in the District Court that anyone else other than the petitioner killed Haag, and in fact, the petitioner admitted that he shot Haag. We note that the ruling in *United States v. Agurs, supra* at 112–113, 96 S.Ct. 2392, apparently alters the rule enunciated in *Brady v. Maryland, supra,* 373 U.S. at 87, 83 S.Ct. 1194, to the effect that where there is a general request, or no request at all, for exculpatory evidence, suppression by the prosecutor of certain exculpatory evidence violates due process only where that evidence creates a reasonable doubt as to the *guilt* of the accused, *not* as to the *punishment* of the accused. *See United States v. Stassi,* 544 F.2d 579, 584 (2d Cir. 1976); *Garrison v. Maggio,* 540 F.2d 1271, 1273, 1274 (5th Cir. 1976); *United States v. Jackson,* 536 F.2d 628, 632 (5th Cir.), *petition for rehearing denied,* 538 F.2d 95 (1976). Therefore, even if the statement of Pauline Williams were somehow material as to the locale of the shooting, this cannot be said to constitute evidence of self defense. Also, even if petitioner's act constituted any evidence of the lesser-included offense of manslaughter, which we dispute, *Agurs* indicates that the suppression of such evidence would not constitute a denial of due process warranting a new trial, because at most the evidence would be material only to petitioner's punishment. We note further, however, that the statement of Pauline Williams did not offer any significant support to any claim of adequate or sufficient provocation because Pauline Williams merely stated that Haag was in the rear of the bar when he was shot, but she said nothing as to whether there was any conversation or fight between the petitioner and Haag.[1]

---

1. It should also be noted that there is a serious question as to whether the issue of manslaugh-

ter was even properly before the jury in the present case, because Ohio law has been clear

Finally, what we have stated previously with respect to the relationship of petitioner and his father with Pauline Williams raises the serious question whether either petitioner or his counsel actually knew before trial of the existence of the statement of Pauline Williams. We are of the opinion that even if he or his counsel were not aware of such statement, in such case they should have known of it because due diligence would have revealed its existence. Clearly, a minimal investigation would dictate that defense counsel should interview all employees of the Wayside Inn who were present on the night of the shooting, and particularly employee Pauline Williams, with whom the petitioner and his father were acquainted, and with whom they had spoken that very night in the Inn.

As this Court stated in *Maglaya v. Buchkoe,* 515 F.2d 265, 268 (6th Cir.), *cert. denied,* 423 U.S. 931, 96 S.Ct. 282, 46 L.Ed.2d 260 (1975):

> The rights protected under *Brady v. Maryland, supra,* are not violated when a defendant in a criminal trial has full knowledge of the existence of the evidence prior to trial and makes no effort to obtain its production.

Defense counsel in the present case was, as stated in *United States v. Tramunti,* 500 F.2d 1334, 1349–50 (2d Cir.), *cert. denied,* 419 U.S. 1079, 95 S.Ct. 667, 42 L.Ed.2d 673 (1974), "on notice of the basic facts which could have produced this alleged exculpatory testimony." *See generally, United States v. Hoffa,* 382 F.2d 856, 862 (6th Cir. 1967), *cert. denied,* 390 U.S. 924, 88 S.Ct. 854, 19 L.Ed.2d 984 (1968); *United States v. Young,* 426 F.2d 93, 95 (6th Cir.), *cert. denied,* 400 U.S. 828, 91 S.Ct. 55, 27 L.Ed.2d 57 (1970).

since the Ohio Supreme Court's decision in *State v. Nolton,* 19 Ohio St.2d 133, 249 N.E.2d 797 (1969), decided on July 16, 1969 (approximately six months before the trial in the present case began) that, as stated in the syllabus (which is the law of the case in Ohio) at 133, 249 N.E.2d at 797:

> If in a criminal case the evidence adduced on behalf of the defense is such that if accepted by the trier of the facts it would constitute a complete defense to all substantive

Thus, we are of the opinion that the failure of the prosecution to turn over to defense counsel the pretrial statement of Pauline Williams did not constitute a denial of due process. As the Supreme Court stated in *United States v. Agurs, supra,* 427 U.S. at 109–110, 96 S.Ct. at 2400:

> [T]his Court recently noted that there is "no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case." *Moore v. Illinois,* 408 U.S. 786, 795 [92 S.Ct. 2562, 2568, 33 L.Ed.2d 706]. The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish "materiality" in the constitutional sense.

[Footnote omitted.]

*See also Weatherford v. Bursey,* 429 U.S. 545, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977).

Accordingly, the judgment of the District Court is reversed and the case is remanded with instructions to dismiss the petition for a writ of habeas corpus.

EDWARDS, Circuit Judge, dissenting.

Wagster was convicted on a charge of second degree murder for the shooting death in a bar of one Roy Haag. He was sentenced to life imprisonment after a state court trial in 1970. After exhausting state remedies on a claim that he had been unconstitutionally deprived of exculpatory evidence in the possession of the Prosecuting Attorney, Wagster filed a petition for writ of habeas corpus. After hearing, Judge Duncan, in a careful opinion, granted his

elements of the crime charged, the trier will not be permitted to consider a lesser included offense.

Cited approvingly in *State v. Fox,* 31 Ohio St.2d 58, 258 N.E.2d 358 (1972) and *State v. Strodes,* 48 Ohio St.2d 113, 117, 357 N.E.2d 375 (1976). Clearly if the lesser-included offense of manslaughter was not properly before the jury, then the statement of Pauline Williams, even if arguably supportive of a claim of manslaughter, would not have been material to the case.

habeas corpus petition. Judge Duncan said:

By placing both the petitioner and the defendant at the front of the bar when the shots were fired, Barbara Fagg's testimony severely undercut petitioner's version of the incident. His claim of self-defense may in fact have been illusory on this record, in view of the fact that Haag's knife was found in his pocket after his death. But his claim of adequate provocation found varying degrees of support in the testimony of Phyllis Crank, Felix Wagers, and Anthony Wagster, *if* the jury believed the shooting to have occurred at the rear of the bar. The only persons of record who could testify as to where the shooting occurred were petitioner, Barbara Fagg and Pauline Williams. Petitioner's testimony was subject to impeachment because of his interest in the outcome of the litigation. The suppressed evidence, then, was the testimony of one of only two disinterested eyewitnesses to the location of the decedent and petitioner immediately after the shooting. Given the defense posture—an admission of the shooting and a claim of justification or excuse—the Court cannot say that Williams' testimony, contradicting that of Fagg, was immaterial. On the contrary, the Court holds that her testimony concerning the location in the bar of the actors in this drama was highly material to and probative of whether Wagster's act was second degree murder, or a lesser-included offense. It is simply impossible to discern on this record whether the jury discredited the "barroom brawl" evidence of petitioner, Crank, Wagers, and Anthony Wagster, when the only impartial witness testifying concerning where the shots were fired insisted that the incident occurred in the front of the room.

Judge Duncan relied upon *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). In the latter case the Supreme Court said, "if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed." Analysis of the Pauline Williams statement does indicate substantial contradiction of the principal witness against Wagster, one Barbara Fagg. The net of Fagg's testimony would tend to convince the jury that Wagster pursued Haag toward the front of the bar and shot him at close range, whereas Pauline Williams' testimony would tend to indicate that the shooting occurred at Wagster's table, with Haag doing the approaching. At a minimum this would have a significant impact on the jury on the question of whether this was second degree murder or manslaughter. The defense should have been made aware of this evidence.

I would affirm the judgment of the District Court.