UNITED STATES of America, Plaintiff,

v.

Donald A. TURNER, Defendant.

Crim. A. No. 78–80240.

United States District Court,
E. D. Michigan, S. D.

June 8, 1979.

---

James K. Robinson, U. S. Atty., Detroit, Mich., for plaintiff.

Neil H. Fink, Detroit, Mich., for defendant.

## REGARDING MOTION FOR ACQUITTAL AND MOTION FOR NEW TRIAL

JULIAN ABELE COOK, Jr., District Judge.

### MOTION FOR ACQUITTAL

A Motion for Acquittal is governed by Fed.R.Crim.P. 29. It is granted for only one reason; insufficiency of the evidence to sustain the conviction.

Review of a jury verdict is suspect and, indeed, the Courts have established a rather strict test for granting a Motion for Acquittal. The evidence must be viewed in the light most favorable to the Government, *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), and the credibility of witnesses or the weight of the evidence is not at issue in a Motion for Acquittal. *United States v. Luxemberg,* 374 F.2d 241, 248 (6th Cir. 1967). The test as to whether a Motion for Acquittal should be granted has been expressed in different ways. In the *United States v. Brown,* 584 F.2d 252, 266 (8th Cir. 1978), it was said that a Motion for Acquittal is not proper if the jurors *may* have determined that there was a reasonable doubt and convicted anyway. However, if they *must* have come to the conclusion that there was a reasonable doubt, a Motion for Acquittal is proper. Put another way, if the evidence is such

that the jury *could* have found the Defendant guilty beyond a reasonable doubt, then a Motion for Acquittal is improper. *United States v. Swarthout,* 420 F.2d 831, 832 (6th Cir. 1974).

■ The Court denied the Defendant's Motion for Acquittal made when the Government ended its proofs. The Court had to rule upon the Motion made at that time because it could not (as in the case of a Motion made at the end of the Defendant's proofs but before being submitted to the jury) reserve the ruling. *See* 2 Wright & Miller, Federal Practice & Procedure § 462 & n. 32 (1969). In response to the instant Motion, the Government alleges that the Defendant may not challenge the sufficiency of the evidence under Rule 29 because he did not renew his Motion at the close of all the proofs. However, this was unnecessary because the Defendant did not put in any proofs. *See* 2 Wright & Miller, § 463 & n. 23.

The Defendant bases his Motion for Acquittal upon two grounds: (1) the proofs were insufficient to connect this Defendant with a conspiracy, and (2) the proofs were not sufficient to establish knowledge, an essential element of all three counts of the Indictment. As to each of these two grounds for objection, there are many subgrounds which we will enumerate and examine.

## I.

## PROOFS INSUFFICIENT AS TO CONNECT THE DEFENDANT WITH A CONSPIRACY

### A.

In *United States v. Leon,* 534 F.2d 667 (6th Cir. 1976), it was said that "[if a] conviction is supported *only* by *circumstantial evidence* from which [we] can *infer either* facts tending to prove the defendant's guilt, *or* facts tending to prove his innocence," then a verdict of guilt cannot stand. The Defendant asserts that this proposition applies here.

The Government has responded to this assertion as if the Defendant is arguing that a jury verdict based on circumstantial evidence cannot stand unless there is no reasonable hypothesis, except that of guilt. Clearly, if this was the Defendant's contention, such an argument would fail. *United States v. VanHee,* 531 F.2d 352, 358 (6th Cir. 1976). The "hypothesis rule" has been systematically criticized and abandoned. *See* 2 Wright & Miller, § 467 at 255 & nn. 63–65.

■ However, this Court does not read *Leon* as being such a hypothesis case. If it were, it would be out of sequence with long established precedents in this Circuit. Rather, we read *Leon* as tautological for purposes of Rule 29. To wit, if this Court concludes that the circumstantial evidence establishes no more than a choice between reasonable inferences of fact (i. e., one tending to support criminality and the other innocence), a verdict of guilt must be set aside because the evidence is insufficient. Put another way, the evidence is not such a jury *could* have found the Defendant guilty beyond a reasonable doubt or, in such case, there *must* exist a reasonable doubt.

■ This case is clearly distinguishable from *Leon.* There was ample evidence, albeit circumstantial, to support this Defendant's conviction. The circumstantial evidence was strong in pointing to the Defendant's involvement in the conspiracy and to the commission of the two substantive offenses. We do not have the "toss up situation" involved in *Leon.* The theory of innocence proffered here was a weak one. It is obviously *not* the case here that "the evidence as to [the] element of [the] crime is equally consistent with the theory of innocence as with the theory of guilt." *United States v. Leon,* 534 F.2d at 677.

■ The Defendant, in urging *Leon* upon us, places special emphasis upon language we have already quoted: "[A] conviction must be reversed because there is no direct evidence of his guilt, and the conviction is supported *only* by *circumstantial evidence* from which one can *infer either* facts

tending to prove defendant's guilt, *or facts tending to prove his innocence.*" *Id.* It would be improper to take this sentence out of context and hold that when *any* inference of innocence (arising out of circumstantial evidence) exists, the Court must acquit. The comparison of inferences (arising from circumstantial evidence) of guilt and innocence, require acquittal only when they are of an equal magnitude or strength. To hold otherwise would be to return to the old and rejected "only hypothesis" rule. By concluding that inferences of guilt and innocence are of an equal weight is but another means of saying that reasonable people must conclude there was a reasonable doubt as to guilt. That clearly is not the case here.

### B.

The Defendant cites *United States v. Hysohion,* 448 F.2d 343, 346 (2nd Cir. 1971) for the proposition that "a mere casual facilitator who only knew a source of drugs, but who lacked a working relationship with the principle that enables assurance of delivery" cannot be held to a conspiracy conviction. The Defendant here alleges he was such a "mere casual facilitator."

■ The Court believes that the evidence viewed in the light most favorable to the Government precludes it from concluding that Turner was a "mere casual facilitator." The Defendant stated he introduced De-Smyter to his friend, Korman. We cannot say, in light of this, that the jurors could not reasonably infer that Turner was able to assure delivery, given the nature of his relationship with DeSmyter and Korman.

Even if we were to assume that Turner was a "mere casual facilitator," such was relevant in *Hysohion* only for the purpose of showing that there was no unlawful agreement between the alleged conspirators. Given that other evidence is present to establish the existence of a conspiracy (as it is in this case), the Court does not believe that a showing of status as a "mere casual facilitator" constitutes a defense to being held a co-conspirator (unless, of course, by such a proffer, the Defendant can simulta-

neously and necessarily show that he was not involved in the conspiracy and/or that no agreement existed.)

### C.

Next, the Defendant argues his recorded tape conversations with Blanchard (Exhibit 9) were, at best, equivocal as to supporting any inference that he agreed to participate in the conspiracy. However, the tapes were not the only evidence from which inferences of participation could be drawn. We have the testimony of Blanchard that he was told to contact the Defendant when he got to Detroit, and the Defendant would advise him as to what to do. (12/11/78 Tr. at pp. 11, 20, 51, 52). Moreover, the circumstantial evidence in the aggregate could easily allow a reasonable juror to conclude beyond a reasonable doubt that the Defendant was involved in the conspiracy. Notwithstanding this, I think that the tapes themselves support inferences of participation.

### D.

It is asserted that the Defendant was not sufficiently linked to the conspiracy as the Defendant was not sufficiently linked to the conspiracy in *United States v. Brown,* 584 F.2d 252, 262 (8th Cir. 1978). However, *Brown* presupposes the evidence "is equally strong to infer innocence of the crime charged as it is to infer guilt." This is the same description of insufficiency we saw in *United States v. Leon,* discussed *supra.* Our conclusion that the strength of the inference of guilt was great in comparison to the weaker inference of innocence, causes us to reject this citation of *Brown. Leon* and *Brown* apply the same test as to determining sufficiency.

### II.

### PROOFS WERE NOT SUFFICIENT TO ESTABLISH KNOWLEDGE

The Defendant alleges the proofs were insufficient to establish his knowledge of a controlled substance being involved in the transaction underlying all three counts of the Indictment. The Defendant thereby

continues to argue what he unsuccessfully asserted in the Motion for Acquittal made at the close of the Government's proofs.

We agree with the Government that knowledge was established by showing the Defendant consciously avoided knowledge of the presence of cocaine (or at the least, of some controlled substance). The Court is of the belief that conscious avoidance was at the crux of this case, and also that the proofs as to this point were as compelling as proof of such a thing can be. That conscious avoidance is no escape from criminal liability is well established in this and other Circuits. *United States v. Smith*, 561 F.2d 8, 13 (6th Cir. 1973); *United States v. Morales*, 577 F.2d 769, 773–76 (2nd Cir. 1978); *United States v. Resptrepo-Granda*, 575 F.2d 524, 527 (5th Cir. 1978); *United States v. Hanlon*, 548 F.2d 1096, 1101 & n.8 (2nd Cir. 1977). We gave a special instruction to that effect.

Also, the Government is correct that it need not prove knowledge of a specific controlled substance. *United States v. Jewell*, 532 F.2d 697, 698 (9th Cir. 1976). However, it seems clear that there was more than sufficient evidence before the jury to sustain the inference that Turner knew, or consciously avoided knowledge of, the presence not only of a controlled substance, but more particularly, of cocaine.

### A.

The Defendant states, in order to convict, the jury had to impute Agent Bodella's specialized knowledge of the drug trade of Bolivia to the Defendant. He argues that after presentation of such evidence to the jury, they were left to speculate on the question of innocence or guilt of the Defendant, citing *United States v. Leon*, 534 F.2d at 677.

Agent Bodella was qualified as an expert witness (December 14, 1978 Tr. at 7). However, in light of potential prejudice to the Defendant, he was specifically instructed not to render an opinion as to the ultimate fact in issue; to wit, Turner's knowledge of the presence of cocaine or a controlled substance. (December 14, 1978 Tr. at 7). He testified that in his expert opinion the taped conversations between Turner and Blanchard (Exhibit 9) were narcotic related conversations. More specifically, he believed they were cocaine related conversations.

The Court rejected proffer of Bodella's expert opinion testimony that the Defendant knew of the cocaine's presence. Although admissible under Rule 704, the Court felt such testimony's prejudicial impact outweighed its probative value under Rule 403. We did not allow such direct opinion evidence to go before the jury to protect the rights of the Defendant. However, we could not preclude the jurors from drawing the inference that the Defendant knew of the cocaine's presence based upon the opinion of Bodella regarding the taped conversations being narcotic related. To inhibit the drawing of such an inference by excluding all of the testimony of Bodella would have given credence and sanction to the conscious avoidance which the evidence indicates the Defendant attempted and which Bodella's testimony regarding the tapes helped establish.

Bodella also testified that the only controlled substance exported from Bolivia was cocaine. Defendant argues that there is no basis for imputing this knowledge to the Defendant. As we indicated above, the Government did not have to prove that the Defendant knew a specific controlled substance was involved and, therefore, such an imputation was not necessary to the verdict being sustained.

Moreover, even if imputation of knowledge of Bolivia's exports to the Defendant was baseless, other aspects of Bodella's testimony (discussed above) served as sufficient quantums of evidence to justify an inference of knowledge, or conscious avoidance thereof, of cocaine.

The Court is of the belief that the jury was not left to speculate upon guilt in view of two equally strong inferences—one of knowledge and one of the absence of knowledge. As noted earlier, the evidence of conscious avoidance was strong in this case.

### B.

The Defendant cites *United States v. Williams*, 503 F.2d 50, 54 (6th Cir. 1974) as standing for the proposition that the acquitted Defendants there did not have the requisite knowledge. He argues his guilty verdict should similarly be vacated. What "knowledge" is referred to in this argument is unclear. The Defendant simply says "as in *Williams*, the evidence in the case at bar was insufficient to show knowledge of Donald Turner."

*Williams* involved the entering of a Judgment of Acquittal on the criminal conspiracy conviction of a young man who was caught with his father and another co-Defendant flushing heroin and cocaine down the toilet. The reason for the acquittal in that case was clear. The agents broke into a motel where the Defendants had gathered. They caught the Defendants totally by surprise and entered unannounced. The Court reasoned, therefore, that there was no evidence of an agreement (or an opportunity to come to an agreement) or of any of the Defendants committing an overt act with knowledge that it was made in furtherance of an agreement. The conviction could not stand simply because there was no showing of one or more of the essential elements of conspiracy. Clearly, that is not the case here. The evidence taken in the light most favorable to the Government establishes that a conspiracy existed, notwithstanding the taped phone conversations.

If *Williams'* is cited to show that the Defendant did not have knowledge of the drug related transaction, it is inapposite. It is patently clear from *Williams* that the Defendant knew of the presence of drugs. All of the Defendants were in the room and one of them flushed the cocaine and heroin down the toilet. The knowledge not present was knowledge by *one of them* that he was committing an overt act in furtherance of a prior agreement.

### C.

Defendant's citation of *United States v. Torres*, 519 F.2d 723, 726 (2nd Cir. 1975) regarding telling a willing seller how to contact a willing buyer, suffers from a similar defect. The relevant language of *Torres* is lifted from *United States v. Hysohion*, 448 F.2d 343, 347 (2nd Cir. 1971) discussed *supra*. In *Hysohion*, the Court said that "the fact that Rimbaud told Everett, a willing buyer, how to make contact with a willing seller does not necessarily imply that there was an agreement between that seller, who was Roupinian, and Rimbaud." *Hysohion* found no unlawful agreement existed and also found that such an agreement could not be inferred from connecting a willing buyer and a willing seller. That seems obvious; there need not be an agreement for such a connection to be arranged. In that respect, *Hysohion* resembles *Williams*.

However, *Hysohion does not* stand for the proposition that once a conspiracy is found to exist, a person is not necessarily a part of the conspiracy if he merely connects up a willing seller and a willing buyer. Serving in such a connective capacity might well be essential to the continuance of the conspiracy once it is in existence. To the extent that it can be said that *Torres* dicta reads *Hysohion* as standing for such a proposition, this Court would reject such a reading.

Finally, the assertion that Turner was a mere associate of the conspiracy does not seem to be reasonable in light of all the evidence, much less so insufficient as to sustain the jury verdict.

For the foregoing reasons, the Motion filed by the Defendant for Acquittal is, and shall be, DENIED.

### MOTION FOR A NEW TRIAL

The Defendant raises eight different grounds in his Motion for New Trial. We shall cover them seriatim.

### I—III

The first three grounds are similar. Because of this, they shall be examined together. One, the Court erred in denying his Motion for Acquittal made at the close of the Government's proofs; two, that the ver-

dict was against the weight of the evidence; and three, that the verdict was not supported by substantial evidence.

 A Motion for Acquittal and a Motion for New Trial based on the ground that the verdict is against the great weight of the evidence are governed by very different standards. The Motion for New Trial involves a much broader standard of review than a Motion for Acquittal. A verdict may well be against the great weight of the evidence, but, nevertheless, be substantial enough to permit reasonable jurors to draw an inference of guilt. In a Motion for New Trial, the trial judge can consider the credibility of the witnesses and the weight of the evidence to insure that there is not a miscarriage of justice. It has often been said that he/she sits as a thirteenth juror.

 Nevertheless, granting a Fed.R. Crim.P. 33 Motion for New Trial attacking the weight of the evidence is a discretionary matter. The Court should exercise such discretion only in the extraordinary circumstance where the evidence preponderates heavily against the verdict. 2 Wright & Miller, § 553 at 487 & n. 31. As the Government indicates, Motions for New Trials are not favored and granted only with great caution. *United States v. Garner*, 529 F.2d 962, 969 (6th Cir. 1976).

 The Defendant resurrects here as grounds for a new trial those which were initially made at the close of the Government's proofs in a Motion for Acquittal; namely, the inadequacy of the proofs to show (1) the existence of a conspiracy, (2) the Defendant's involvement in the conspiracy, and (3) requisite knowledge as to all three counts. The Defendant makes no argument as to why, after denying the Motion for Acquittal made at the close of the Government's proofs, we should grant him a new trial. He makes no specific allegation of a miscarriage of justice occurring because of the silent nature of the Government's proofs. The Court believes the evidence, although primarily circumstantial as to the issues raised by the Defendant, certainly preponderates towards guilt. (See discussion above denying Defendant's renewed Motion for Acquittal). There is not the kind of disparity as to the evidence's weight that would precipitate granting a Rule 33 Motion on the ground that the verdict is against the great weight of the evidence.

## IV

Next, the Defendant argues that the Court was incorrect in finding that a conspiracy existed by the preponderance of the evidence as required by *United States v. Enright*, 579 F.2d 980 (6th Cir. 1978). This issue was thoroughly litigated at trial, and the Defendant neither offers any case authority, nor points to any testimony which would indicate why the Court should retreat from the position that it previously took. Moreover, there has been no showing of the kind of abuse of discretion in determining that it was more likely than not that a conspiracy existed necessary to mandate a new trial.

## V

Defendant argues that a new trial should be forthcoming because the Court did not find that he was entrapped as a matter of law. This is interesting in view of the continued and strenuous contention by the Government that entrapment was thoroughly improper in this case.

 At the time the entrapment issue was raised, it appeared to the Court an essential precondition to raising entrapment in this Circuit was absence of denial of every element of the offense, citing *United States v. Shameia*, 464 F.2d 629 (6th Cir. 1972). (December 15, 1978 Tr. at 7). Whether *Shameia* should be read as requiring the Defendant to admit all of the acts constituting the offense troubled the Court. The Court considered the Defendant's citation of *United States v. Demma*, 523 F.2d 981 (9th Cir. 1975) criticizing the requirement of admission of all acts constituting the offense as a precursor to raising an entrapment defense. The Court was also troubled by the closeness of the question and considered, therefore, one of its general

working proposition: In criminal cases, close questions go to the Defendant. These concerns motivated the Court to change its mind and permit the entrapment instruction. However, given the closeness of the question as to permitting the entrapment defense from even being raised, and given that the Defendant entered no proofs in support of entrapment, *see United States v. Demma*, 523 F.2d at 985, it seems incredible that the Defendant sincerely asserts entrapment as a matter of law.

■ The resolution of any factual dispute as to the existence of entrapment is, of course, for the jury. *United States v. Jones*, 575 F.2d 81, 84 (6th Cir. 1978). If anything, one of the issues being argued at trial was something to the effect that entrapment did not exist as a matter of law. Nevertheless, we thought there were facts from which the jury could possibly infer entrapment. If this had been an analogous civil question (such as Fed.R.Civ.P. 56 Motion for Summary Judgment), we would have denied the Defendant's request and let the issue go to the jury because we believed a more stringent standard applies than whether there is any genuine issue of material fact. If any error occurred as to entrapment, it was in favor of the Defendant.

## VI

Turner alleges the Court erred in failing to instruct the jury that the informer-witness, Jack Blanchard, was a Government agent. He claims this was necessary for the jury's full consideration of his entrapment defense, citing *United States v. Sheldon*, 544 F.2d 213 (5th Cir. 1976).

■ The Court did instruct the jury that Blanchard was a Government informer and, because of this status, his testimony should be viewed with greater scrutiny than other testimony. Devitt & Blackmar, Federal Jury Practice & Instructions § 1702 (3d ed. 1977). The Court refused, however, to instruct that Blanchard was a Government agent because we believed then, and still believe now, that the word "agent" would incorrectly imply that Blanchard was a paid D.E.A. employee. By instructing that

Blanchard was an informer or by other conduct, the Court never gave the jurors the impression that they could not infer Government inducement from the informer's activity as the District Court apparently did in *United States v. Sheldon*, 544 F.2d at 220, 221. In fact, by giving the instruction, the Court gave the jury an opportunity to infer Government inducement from Blanchard's activity. They simply chose not to draw that inference.

As the Government appropriately points out, *Sheldon* involved some other problems. The trial judge interrupted the Defendant's witness some 130 times, commented upon the defense of entrapment to the jury, and gave no standard instruction on entrapment. Also, as alluded to above, in *Sheldon*, the Court indicated the jury would not consider the activity of the informer in deliberating upon entrapment. I do not think that, by calling the instruction in *Sheldon* erroneous, the Fifth Circuit in any way implied "informers" are to be labeled "agents."

## VII

■ The Defendant contends that the Court should grant a new trial in view of the admission of Agent Bodella's testimony. The Court permitted Bodella to testify as an expert with explicit qualifications. First, the Court, as required by Fed. R.Evid. 702 found that Agent Bodella was an expert qualified to give opinion evidence. (December 14, 1978 Tr. at 7). Such a finding is clearly within the sound discretion of the trial court and upset only by a showing of manifest error. *See Salem v. United States Lines Company*, 370 U.S. 31, 35, 82 S.Ct. 1119, 8 L.Ed.2d 313 (1962); *Heuss v. Rockwell Standard Corporation*, 495 F.2d 1207 (6th Cir. 1974); *Heard v. Mueller Company*, 464 F.2d 190 (6th Cir. 1972). Moreover, the admissibility of proffered expert testimony under Rule 702 is determined by whether the specialized knowledge involved "will assist the trier of fact to understand [other] evidence or to determine a fact in issue." Such determinations as to admissibility have also been held to be within the broad discretion of the trial judge.

Nevertheless, the Court agrees (and is compelled to agree) with the Court in *United States v. Green*, 548 F.2d 1261, 1268 (6th Cir. 1977), cited by the Defendant, that the "two variables to be weighed in assessing the propriety of expert testimony . . . are deficient when applied to criminal cases." Rule 702 fails to include potential prejudice to a criminal Defendant as a factor. *Green* has added a gloss upon Rule 702 which requires the Court to weigh potential prejudicial impact in determining whether to admit expert testimony in a criminal case. When the expert testimony of Agent Bodella was proffered, the Court closely considered such impact in determining whether to admit his testimony. We conditioned admission with certain specific limitations; to wit, that the witness could not testify as to his opinion regarding the Defendant's knowledge. The Court is of the belief, therefore, that it complied with the *Green* caveat to Rule 702.

The argument that Bodella's testimony was without sufficient foundation is not well taken. The trial court, in its broad discretion (which we believe is not upset by the *Green* qualification to Rule 702) determined that Bodella was an expert. His testimony as to the exports of Bolivia was clearly within the parameters permitted under Rule 703.

## MOTION FOR NEW TRIAL BECAUSE OF GOVERNMENTAL MISCONDUCT

Defendant asserts Governmental misconduct as the final ground for granting a new trial.

### I

### JURISDICTION

The Government attaches great significance to its argument that the Defendant has failed to raise the issue of Governmental misconduct within the seven days mandated by Fed.R.Crim.P. 33. It is true that if a Motion for New Trial under the Rule is not made within seven days, the only grounds that can be asserted is that of newly discovered evidence. This is because the time limits of Rule 33 are jurisdictional, and the District Court is not empowered to extend the time to file the Motion unless a request to extend is made and the Court acts upon that request within the seven day period. *United States v. Smith*, 331 U.S. 469, 473–76, 67 S.Ct. 1330, 91 L.Ed. 1610 (1947); *United States v. Beran*, 546 F.2d 1316, 1318 & n. 1 (8th Cir. 1976), *cert. denied*, 430 U.S. 916, 97 S.Ct. 1330, 51 L.Ed.2d 595 (1977).

Ascertaining, at the outset of our analysis a resolution of the question as to whether the issue of Governmental misconduct has been properly raised within seven days is important because it may be determinative of what standard to utilize and apply. In a Motion for New Trial based upon newly discovered evidence, four very difficult and exacting factors have traditionally been required: namely, (1) the newly discovered evidence must be unknown to the Defendant at the time of trial; (2) the evidence must be material and not merely cumulative or impeaching; (3) the evidence's production must in all probability lead to an acquittal; and (4) failure to learn of the evidence must not be due to a lack of diligence on the part of the Defendant. *See United States v. Rachal*, 473 F.2d 1338, 1343 (5th Cir. 1973); 2 Wright & Miller, § 557 at 515 & n. 95.

Motions for New Trial based upon newly discovered evidence are not favored and are seldom granted. *United States v. Garner*, 529 F.2d 962, 969 (6th Cir. 1976). It is also clear that there is a much greater burden which is requisite upon the moving party who bases his Motion for New Trial upon newly discovered evidence than if he bases that Motion upon other grounds raised within seven days of the verdict. *See United States v. Ellison*, 557 F.2d 128, 133–34 & n. 3 (7th Cir. 1977); *United States v. Rachal*, 473 F.2d at 1343. However, Motions for New Trial based upon Governmental misconduct seem to be distinct from Motions for New Trial based upon newly discovered evidence even when the same facts give rise to these alternative theories of relief. *See United States v. Garner*, 529 F.2d at 968–69.

Is the Government correct in stating that the Motion for New Trial based upon Governmental misconduct was not raised within seven days as required by Rule 33, and therefore, it must be taken by the District Court as a Motion based upon newly discovered evidence?

■ The jury returned a verdict of guilty on December 18, 1978. Computation of time is governed by Fed.R.Crim.P. 45(a), which is substantially the same as Fed.R. Civ.P. 6(a) governing time computation in civil cases. See Fed.R.Crim.P. 45(a) Advisory Committee Note. The first sentence of Rule 45(a) provides, "[i]n computing any period of time the day of the act or event from which the designated period of time begins to run shall not be included." Hence, the first day of the allotted seven days was December 19, 1978; the seventh day was December 25, 1978. The Motion for Acquittal and the Motion for New Trial were filed on December 26, 1978—the eighth day. Notwithstanding this, the Motion was timely filed because "[t]he last day of the period so computed shall be included, unless it is a . . . legal holiday, in which event the period runs until the end of the next day which is not a Saturday, a Sunday, or a legal holiday." December 25, 1978 was Christmas Day—a "legal holiday" explicitly recognized by Rule 45(a).

Paragraph 8 of the first pleading filed on December 26, 1978, and captioned "Motion for New Trial" read as follows:

A new trial is required in the interest of justice. The grounds for a new trial, mentioned above, are more fully set out in the attached memorandum of facts and authorities.

Defendant respectfully requests leave to file a supplemental memorandum of facts and authorities at such time as the remaining trial transcripts become available.

That pleading was supported by a brief, filed at the same time, and entitled "Memorandum of Facts and Authorities." On Page 5 of that document, the Defendant alleged the following:

In the present case, the Defendant contends that a new trial is required in the interest of justice. This claim includes, but is not limited to governmental misconduct. As the trial transcripts are of paramount importance, thorough discussion of the grounds must await receipt of the remainder of the transcripts.

The Court believes the Government's contention that the Motion was untimely goes to the supplementary memorandum filed on February 2, 1979, and captioned "Supplemental Motion for a New Trial." Attached to that Motion was a pleading entitled "Memorandum in Support of Supplemental Motion for a New Trial." The Court also takes the Government's contention to be that these supplemental pleadings are, in effect, amendments to the Motion for New Trial or should be received as an all together New Motion & Brief in support. There is case authority indicating that such amendments are not permissible under Fed. R.Crim.P. 33, and, that, therefore, the Court is precluded from reviewing such pleadings except as they raise grounds for a new trial alleging newly discovered evidence.

■ As noted earlier, Rule 33 requires a Motion for New Trial (other than on grounds of newly discovered evidence) be brought within seven days. Moreover, it has been held that "[t]he same time limitations apply to statement of grounds for a new trial." *United States v. Dansker*, 561 F.2d 485, 486 (3rd Cir. 1977); *United States v. Newman*, 456 F.2d 668 (3rd Cir. 1972). *See also United States v. Ellison*, 557 F.2d 128, 133 (7th Cir. 1977). These limitations are jurisdictional. Therefore, if we determine that the Defendant did not adequately "state the grounds for a new trial" in his December 26, 1978 pleadings, then, according to these authorities we are without authority to consider such supplemental pleadings except as they allege grounds for granting a new trial based on newly discovered evidence.

Third Circuit cases, some of which have been cited above, indicate that there may be real jurisdictional problems with a party making a timely Motion under Rule 33 but

then attempting, after the seven days have elapsed, to supplant the Motion. *United States v. Dansker,* 561 F.2d at 586; *United States v. Newman,* 456 F.2d at 669–72; *United States v. Hamilton,* 457 F.2d 95, 99–100 (3rd Cir. 1972). *Hamilton* and *Newman* both present fact situations which deserve our attention.

In *Hamilton,* the Defendant made a timely Motion for a new trial and included a clause in it that purported to reserve to him "the right to file additional and supplemental reasons for a new trial when the notes of testimony taken at the trial had been transcribed and a copy thereof made available to counsel for the Defendant." This, in some respects, is similar to what Turner did in his December 26, 1978 Motion. However, there are some important distinctions. In *Hamilton,* the trial judge denied the Defendant the right to pursue the supplemental reasons for a new trial, and the Circuit Court affirmed, characterizing this clause an "omnibus reservation clause." The Court of Appeals went on to state, "[t]he 'reservation clause' in his motion did not state any reasons for a new trial. The trial judge's decision not to take action beyond such time limitation was correct because any order entered would have been without effect." Nevertheless, the Circuit Court considered those reserved issues and found them devoid of merit. The Turner Motion and Memorandum in Support thereof (dated December 26, 1978) specifically stated that he was raising a Governmental misconduct issue. This specific allegation is not comparable to the type of omnibus reservation clause involved in *Hamilton.*

In *United States v. Newman,* 456 F.2d 668, the Government successfully obtained a Writ of Mandamus to compel the District Court to vacate its order granting a new trial. The Court of Appeals said that the order was not entered for reasons raised by the Defendant in his timely Motion for a New Trial but for reasons raised by the District Court on its own Motion. The Circuit Court said that District Courts do not have the power under Rule 33 to grant a new trial on their own Motion. The Rule specifically provides the Court, "*on motion of the defendant*" may grant a new trial if required in the interests of justice. Clearly, *Newman* is distinguishable. The Court is not ruling upon a Motion for a New Trial on grounds it raises, but rather upon a ground raised by Turner, in his December 26, 1978 memorandum.

Other Third Circuit District Court cases seem to be distinguishable for similar reasons. In *United States v. Mathews,* 335 F.Supp. 157, 166 (W.D.Pa.1971), a Motion for New Trial suffered from having an omnibus reservation clause like the one in *Hamilton.* Also, *United States v. Kane,* 319 F.Supp. 527, 528 (E.D.Pa.1970) involved raising an additional ground without proper extension. *United States v. Dabney,* 393 F.Supp. 529, 548 (E.D.Pa.1975) found an additional ground improper because it was raised orally (although raised in the appropriate time for granting an extension) and, therefore, defective under Fed.R.Crim.P. 47. What is involved here is a request and statement of grounds made in writing.

■■■■ Accordingly, we believe that Turner has complied with the requirements of Rule 33 as the Motion relates to Governmental misconduct. Even in the Third Circuit, it would appear that the trial court has discretion whether to postpone the filing of the particulars relating to a given ground for a new trial. *United States v. Williams,* 254 F.2d 253, 254 (3rd Cir. 1959). It is a matter of discretion what we characterize to be a "ground" raised in a timely fashion, or a "Motion" made, in a timely fashion. This Court concludes that the document, although captioned "Supplemental Motion for a New Trial" and filed on February 2, 1979, is simply a memorandum stating facts supplanting the December 26, 1978 "Motion for a New Trial" based on the ground of Governmental misconduct. We also note that Turner moved the Court to grant him leave to file a supplemental memorandum of fact and authority at such time as the remaining trial transcripts became available to him (December 26, 1978 "Motion for New Trial" at 2). The Court, through oral communication with the counsel for Turner via

a staff member, indicated that it would permit him that additional time.

It could be argued that in order to file such a supplemental memorandum the Court would have to enter an Order. Such an argument would be premised upon Fed. R.Crim.P. 45(b) requiring the Court to order any enlargement of time when an act is required to be done within a specified time. Moreover, Rule 45(b) provides that the Court may not extend the time for taking action under Rule 33. The Court believes Rule 45(b) does not inhibit consideration of the supplemental pleadings because we believe there was full compliance with Rule 33. Turner filed his "Motion for New Trial" and stated the specific grounds in a timely fashion. The Court merely granted Turner's request to file supplemental pleadings. By simply granting the Defendant a right to file supplemental pleadings, when the prior pleadings had fully stated the grounds upon which relief was requested, there was no necessity for entry of an order.

## II

### APPLICABILITY OF TRADITIONAL REQUIREMENTS REGARDING GRANTING A NEW TRIAL ON MOTION FOR NEW TRIAL BASED UPON NEWLY DISCOVERED EVIDENCE

After having walked through the jurisdictional maze related to Motions for New Trial and because we have concluded the Motion (as it relates to Governmental misconduct) was raised within seven days, this Court has reached the conclusion that the request for a new trial based upon Governmental misconduct may be granted if it is determined "to be in the interest of justice." See Moore's Federal Practice ¶ 33.-02[1] at 33–3 & n. 1 (1965). We note, however, that most of the case authority dealing with Governmental misconduct requires a showing of specific criterion, since the challenge is ordinarily of a Constitutional character. Even if we were to consider this to be a Motion based upon newly discovered evidence, however, it would not be neces-

sary for the movant to make out the four elements traditionally required if the defect were of a Constitutional magnitude.

On the one hand, the fact that such evidence was available to the prosecutor and not submitted to the defense places it in a different category than if it had simply been discovered from a neutral source after trial. For that reason, the defendant should not have to satisfy the severe burden of demonstrating that newly discovered evidence probably would have resulted in acquittal. If the standard applied to the usual motion for a new trial based on newly discovered evidence were the same when the evidence was in the State's possession as when it was found in a neutral source, there would be no special significance to the prosecutor's obligation to serve the cause of justice.

*United States v. Agurs*, 427 U.S. 97, 111, 96 S.Ct. 2392, 2401, 49 L.Ed.2d 342 (1976).

■ In view of this language, I think that the Government's citation of *United States v. Cardarella*, 588 F.2d 1204 (8th Cir. 1978) is inappropriate for two reasons. First, Constitutional errors (denial of due process) have been argued here. Second, we have concluded the Motion was made within seven days. To the extent that *Cardarella* is read as overlooking the above cited language of *Agurs*, it has to be disregarded. Other Circuits have relaxed the traditional elements regarding a motion for new trial based upon newly discovered evidence when governmental misconduct is averred. *United States v. Butler*, 567 F.2d 885, 889–90 (9th Cir. 1978); *United States v. Sutton*, 542 F.2d 1239, 1242 & n. 3 (4th Cir. 1976). This Court, therefore, is of the belief that making out the traditional elements of a new trial based on newly discovered evidence is not necessary (a) if the motion is made before the seven days have run, or (b) if the alleged error is of a constitutional nature, or, even, perhaps (c) if the motion is based upon the mere allegation of governmental misconduct. (Given our determination that the motion was made within seven days, consideration of the third proposition is not necessary here).

We have further narrowed our focus as to the test for granting a new trial based upon an allegation of Governmental misconduct to the following propositions:

(1) It is not necessary for Turner to make out the rigorous factors traditionally required to obtain a new trial based upon newly discovered evidence,

(2) Allegations of Governmental nondisclosure of exculpatory evidence may constitute a denial of due process. *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963),

(3) The standard for ascertaining whether there has been a denial of due process because of *nondisclosure of promises made to a witness* is governed by *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1975) and a line of subsequent cases,

(4) We can grant a new trial if we determine such to be "in the interest of justice." There may be circumstances where a trial does not violate minimum threshold Due Process guarantees of a Defendant, but "the interests of justice" mandate retrial. However, to the extent that we consider the Defendant's Motion for New Trial, we will first consider it in terms of a denial of Due Process.

## III

### PROCEDURAL AND EVIDENTIARY CONCERNS

Allegations of Governmental misconduct here relate to two areas:

(1) The alleged suppression of the reverse side of Government's Exhibit 4 (a sheet of paper upon which Jack Blanchard wrote instructions from John Keith DeSmyter) and the reverse side of Government's Exhibit 9 (taped conversations between Turner and Blanchard).

(2) The alleged suppression of information regarding Governmental leniency shown to Blanchard.

Because the second is the more serious contention, we shall address it first. The Defendant argues that the Government kept vital information from the defense regarding the nature and extent of its relationship with the witness Blanchard. At various points in the Defendant's pleading, it is asserted that this was accomplished by (1) the perjury of the witness Blanchard, (2) the perjury, or at least the material misrepresentations of D.E.A. Agent Steven Gibbs, and (3) the conduct of Mr. Christopher Andreoff, the Assistant United States Attorney in charge of the *Turner* case. To begin with, we must ascertain what evidence is alleged not to have gone to the jury, or what evidence is alleged to have gone to the jury in a distorted form. The only way to do this is to compare what evidence, in fact, went to the jury with the evidence that the Defendant alleges gives rise to a Constitutional violation under *Giglio*.

### A.

#### General Burden on Movant

First and foremost, we realize that on a motion for new trial, the burden is clearly upon the Defendant movant. He is the party attacking a jury verdict that is presumptively valid. *United States v. Gross*, 375 F.Supp. 971, 973–4 (D.N.J.1974). The extent of the burden may vary given the nature of the grounds alleged for new trial, but the burden of persuasion is always upon the movant. *See United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342; *United States v. Butler*, 567 F.2d at 887 (production of substantial new evidence); *United States v. Sutton*, 542 F.2d 1239, 1241–42 & n. 3 (4th Cir. 1976). *See also United States v. Mackin*, 183 U.S.App. D.C. 65, 561 F.2d 958, 961, *cert. denied*, 434 U.S. 959, 98 S.Ct. 490, 54 L.Ed.2d 319 (1977) (As to perjured testimony, to grant a new trial under the *Larrison*, [*Larrison v. United States*, 24 F.2d 82, 87 (7th Cir. 1928)] standard, a "court [must be] reasonably well satisfied that the testimony given by a material witness is false,"); *United States v. Wayman*, 510 F.2d 1020, 1024 (5th Cir. 1975) (to gain new trial on the basis of impartial jury, the Defendant is burdened to show bias by a preponderance of evidence).

**600**

### B.

### Hearing

 The Defendant sought an Evidentiary Hearing on his Motion for New Trial. Whether or not the Court grants a hearing to the movant is a matter of discretion. *United States v. Ward*, 544 F.2d 975, 976 (5th Cir. 1976). Such a motion can be decided on affidavits alone. *United States v. Johnson*, 327 U.S. 106, 66 S.Ct. 464, 90 L.Ed. 562 (1945); *United States v. Hoffa*, 382 F.2d 856, 864–65 (6th Cir. 1967). Even when Governmental misconduct of some type is alleged, it is not improper for the District Court to waive a hearing and decide the matter on affidavits. *United States v. Nace*, 561 F.2d 763, 772 (9th Cir. 1977). However, there are limits to this discretion, especially when Governmental misconduct is alleged. An Evidentiary Hearing may be necessary to insure an adequate record upon which to base an enlightened ruling. *United States v. Disston*, 582 F.2d 1108, 1110–12 (7th Cir. 1978).

### C.

### Evidence

We granted the Request for an Evidentiary Hearing and even adjourned that hearing based upon the representation of Turner that further investigation was necessary for a complete presentation of his position. On the date of the hearing, both the parties told the Court that they wished to proceed by way of affidavit and would offer no testimony or other evidence.

Therefore, what the Court has precisely before it is (a) its own record of the trial, transcript and exhibits, and (b) two affidavits. One affidavit is that of Ms. Lurana S. Snow, Blanchard's defense counsel in a criminal proceeding in the United States District Court for the Southern District of Florida, *infra*; the other being a counter-affidavit of Mr. Christopher Andreoff, the Assistant United States Attorney in charge of this case. This is the only evidence from which we can make a determination as to whether the Defendant has sustained his burden. *See United States v. Osborn*, 415

F.2d 1021, 1025 (6th Cir. 1969). It may be that an affidavit, even taken at face value, cannot provide support for suggestions made in a brief. If such support is essential to sustaining the burden imposed, then the motion must fail. *United States v. Nickells*, 552 F.2d 684, 687 (6th Cir. 1977).

### IV

### FINDINGS RE AGENT GIBBS' MISCONDUCT

We next come to the knotty problem of determining just what, in fact, these affidavits and the record establish. Let us look first to the averments made in the affidavit of Ms. Snow as they relate to the role that Special D.E.A. Agent Steven Gibbs played in the case of *United States v. Blanchard*, Case No. 78–129–CR (S.D.Fla.1978).

Ms. Snow was a public defender appointed to represent Blanchard. (Snow Aff. ¶ 1 & 2). She also averred that her client had agreed to cooperate with the D.E.A. immediately following his March 25, 1978, arrest and to participate in a "controlled" delivery of cocaine to Detroit. (Snow Aff. ¶ 3). The testimony of both Blanchard (12/11/78 Tr. at 22–23) and Gibbs (12/8/78 Tr. at 22) are in accord.

However, the remainder of Ms. Snow's affidavit relating to Gibbs' activity varies significantly from Gibbs' trial testimony. Ms. Snow indicated that shortly after her client's arrest, she had a telephone conversation with Gibbs. (Snow Aff. ¶ 4). According to her Affidavit, he communicated the following to her at that time: (1) He was the agent in charge of the *Blanchard* case (Snow Aff. ¶ 4); (2) Due to the nature and extent of Blanchard's cooperation, he would recommend probation if the D.E.A. was successful in apprehending a certain person in Santa Cruz, Bolivia involved in illicit cocaine importation (Snow Aff. ¶ 4); (3) If the D.E.A. was unsuccessful in apprehending that person, the D.E.A. would recommend a sentence not to exceed one year imprisonment (Aff. ¶ 5). Ms. Snow further averred that she had several conversations with Agent Gibbs regarding the success of

the D.E.A. in apprehending the individual in Bolivia (Snow Aff. ¶ 6) and that, on one occasion, Agent Gibbs indicated (1) such a person had been apprehended, and (2) therefore, the D.E.A. would recommend probation for Blanchard (Snow Aff. ¶ 7).

The testimony of Agent Gibbs is very different. On direct examination, he testified to the following: (1) no overtones as to leniency were made to Blanchard after he agreed to cooperate (but prior to his making a statement) (12/8/78 Tr. at 22–23); (2) he and Agent Miller made no promises to Blanchard except that they would, and did, communicate his (Blanchard) cooperation to the United States Attorney's Office in Florida (12/8/78 Tr. at 23–24); (3) to the best of his knowledge, no agreements relative to jail exposure were in existence prior to Blanchard's tender of a guilty plea (12/8/78 Tr. at 25).

On cross-examination, Gibbs testified that (1) the only thing that was done for Blanchard was a dismissal of one of the two counts of the Indictment (12/8/78 Tr. at 39); (2) He stated this was the normal practice in the Southern District of Florida when someone plead guilty, and also that (3) this was the only thing the D.E.A. *could* do for Blanchard (12/8/78 Tr. at 39); (4) Gibbs further stated that, to the best of his knowledge, this was the only thing the United States Attorney's Office was authorized to do for Blanchard (12/8/78 Tr. at 40). (5) He did admit on cross-examination that the Assistant United States Attorney in Florida went to the Judge with a recommendation of probation (12/8/78 Tr. at 40). By contrast, Ms. Snow, in her affidavit, stated that the United States Attorney's Office in Miami recommended probation to the Florida District Court, but only reluctantly and only in view of the promises Gibbs had made to the Defendant (Snow Aff. ¶ 8).

Stated simply, Ms. Snow's affidavit requires we make a factual determination as to whether or not Agent Gibbs promised her and/or Blanchard that the D.E.A. would recommend probation in the *Blanchard* matter.

First, we note that there is no evidence before us that Gibbs ever communicated any such promise of leniency (if one in fact existed) directly to Blanchard. Indeed, Ms. Snow's affidavit can be read to infer the contrary. "That at no time whatsoever were any of the plea bargain negotiations or discussions carried on by anyone other than Special Agent Gibbs and myself." (Snow Aff. ¶ 10). Consequently, any allegations regarding Blanchard's knowledge of any promises that Gibbs may have made, no matter how inferentially compelling, are unsupported by the limited amount of evidence before us. In view of this, we have no means of determining if Blanchard committed perjury when he testified that, to his knowledge, no agreements existed. (12/11/78 Tr. at 74).

Nevertheless, the Court feels compelled to accept the averments of Ms. Snow that Gibbs did promise *her* that Blanchard would receive a recommendation of probation from the D.E.A. We adopt this finding in view of two factors: (1) This was the recommendation that was eventually made to the Florida Court by the Government; (2) Ms. Snow is a person completely disinterested in the present litigation. She had nothing to gain (and a great deal to lose) by fabricating a false affidavit. On the other hand, Gibbs, as a D.E.A. Agent, is an interested person. Additionally, the fact that Blanchard was not sentenced until after he had testified (irrespective of any alleged involvement of the United States Attorney's Office in this District to secure an adjournment of his sentencing) further buttresses the proposition that some arrangement between the D.E.A. and Blanchard's defense counsel had been consummated.

## V

### LEGAL CONCLUSIONS RE AGENT GIBBS MISCONDUCT

#### A.

#### Antecedent Concerns

Before analyzing what standard should apply or what burden the Defendant must

meet, we must address three antecedent problems. First, is it fatal to the request for a new trial based upon Governmental misconduct that there has been no showing Blanchard knew of any leniency arrangements made between his counsel and Agent Gibbs? Second, does the fact that the subject of the alleged misconduct (Agent Gibbs) is not a prosecutor defeat application of *Giglio*? Third, does the fact the jury knew something about (but not the entire extent of) the leniency shown Blanchard defeat proffer of a Government misconduct allegation?

### 1.

### Necessity of the Witnesses Knowledge of the "Deal"

Most cases relating to the Government failing to disclose promises of leniency involve perjury of a witness. For example, in *Giglio*, a co-conspirator witness had received an undisclosed promise of immunity from a United States Attorney and testified that no promise of immunity existed. The United States Attorney who tried the case was apparently unaware of the bargain struck between the witness and his fellow prosecutor and never connected the false statement. The Court reversed holding, *inter alia*, that the prosecutor's office was one entity and a promise made by one of its attorneys must be attributed to the Government.

When the undisclosed bargain or promise is never communicated to the witness, the Government argues *Giglio* is inapplicable. The Fourth Circuit Court of Appeals is in sharp disagreement with such an assertion. In *Campbell v. Reed*, 594 F.2d 4 (4th Cir. 1979), the State prosecutor asked one Lewis Miller, an accomplice of the Habeas Corpus Petitioner, Campbell, if he knew whether any plea agreement had been arranged between himself and the State. He truthfully responded there was not. The prosecutor had, in fact, arranged a plea agreement with Miller's attorney but attached a caveat request that the attorney not communicate this to his client until after Miller testified at Campbell's trial. The Fourth Circuit observed:

The fact that Miller was not aware of the exact terms of the plea agreement only increases the significance, for purposes of assessing credibility, of his expectations of favorable treatment. As we noted in *Boone v. Paderick*, 541 F.2d 447, 451 (4th Cir. 1976), a tentative promise of leniency might be interpreted by a witness as contingent upon the nature of his testimony. Thus, there would be a great incentive for the witness to make his testimony pleasing to the prosecutor. That a witness may curry favor with a prosecutor by his testimony was demonstrated when the prosecutor renegotiated a more favorable plea agreement with Miller after Campbell was convicted.

*Campbell v. Reed*, 594 F.2d at 7–8.

■ As noted earlier, there is no evidence before us that Blanchard knew of the promises made by Agent Gibbs to Ms. Snow. However, under *Campbell*, this is not fatal. In fact, the Fourth Circuit has indicated that under such circumstances, the credibility of a witness is even more suspect when he has occasion to believe that leniency is contingent upon his testimony. Therefore, whether Blanchard knew of the agreement is not requisite to Turner asserting Governmental misconduct. The Government cites other case authority as requiring a showing of the witness' knowledge of the agreement. *See United States v. Ramos Algarin*, 584 F.2d 562, 564 (1st Cir. 1978); *United States v. DiCarlo*, 575 F.2d 952–60 (1st Cir. 1978); *United States v. Vargas-Martinez*, 569 F.2d 1102, 1104 (9th Cir. 1978). All of these cases, however, did not involve facts indicating that the promises were communicated solely to counsel for the witness. They, therefore, are clearly distinguishable. Those Courts did not have before them the precise issue faced in *Campbell* and with which we are now confronted.

The Court believes the reasoning of *Campbell* represents a realistic understanding of the variety of ways in which Government misconduct can occur. The state prosecutor in the *Campbell* case tried to "outfox" the Petitioner and Petitioner's

counsel, and, additionally to avoid his own duty. By communicating about the plea agreement with the witness' lawyer rather than the witness, the prosecutor thought that he would escape the reach of *Giglio* as well as secure supportive testimony by dangling the hoped-for leniency as a carrot.

### 2.

#### Agent Gibbs Non-Prosecutorial Status

 We next address Agent Gibbs non-prosecutorial status as defeating an allegation of Governmental misconduct. In *Giglio,* the Court said:

> The prosecutors office is an entity and as such it is the spokesman for the Government. A promise made by one attorney must be attributed, for these purposes, to the Government. See Restatement (Second) of Agency § 272.

*Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972). Ms. Snow avers (Snow Aff. ¶ 8) that the United States Attorney's Office in the Southern District of Florida honored the promises of Agent Gibbs, and, therefore, it necessarily follows that the United States Attorney's Office in that District was well aware of the promises that Gibbs made regarding Blanchard. Therefore, under the reasoning of *Giglio,* the United States Attorney's Office in Detroit is vicariously charged with the knowledge of its sister office, irrespective of any actual knowledge Mr. Andreoff may or may not have had regarding the arrangements.

Additionally, even if the United States Attorney's Office in Florida had not been involved, and had not known of Gibbs' activity, we think that the agency principles announced in *Giglio* extends to Government agency as well as prosecutors. The Ninth Circuit has recently extended the principles of *Giglio* to Government agents:

> The district court found that Durden and the agents had failed to disclose to the jury in the *Butler* trial the assurances the agents had made to Durden in return for his agreement to cooperate with the prosecution. The prosecutor is responsible for the nondisclosure of assurances made to his principal witnesses even if such prom-

ises by other government agents were unknown to the prosecutor. Since the investigative officers are part of the prosecution, the taint on the trial is no less if they, rather than the prosecutor, were guilty of nondisclosure. *Barbee v. Warden,* 331 F.2d 842, 846 (4th Cir. 1964).

*United States v. Butler,* 567 F.2d 885, 891 (9th Cir. 1978).

> Never once did the agents hint at the full complement of assurances given to Durden. Even if the United States Attorney's Office were totally ignorant of the agents' activities and deceptions, the Government still remained responsible for any and all of their actions. *Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). The agents were nothing less than "an arm of the prosecutor." *United States v. Morell,* 524 F.2d 550, 555 (2d Cir. 1975).

*Id.* at 892 (Ely, J., concurring).

Clearly, the Government is charged with the misconduct of its agents when under a *Giglio* attack. *See also Schneider v. Estelle,* 552 F.2d 593, 595 (5th Cir. 1977).

### 3.

#### Cumulative Nature of Undisclosed Evidence

The Government's most serious rebuttal argument to a finding of Governmental misconduct relates to the undisclosed evidence as being cumulative. The Government enumerates several instances where, on direct and cross-examination of Blanchard, Blanchard's relationship with the Government was extensively explored. (Government's Memorandum in Support of Answer to Defendant's Supplemental Motion for New Trial at 28–29). Most significant are the following:

(1) The record is replete with evidence that Blanchard agreed to cooperate with the D.E.A. with the hope of securing some leniency (12/11/78 Tr. at 22–23, 69, 70, 102–103);

(2) Blanchard knew of the Florida United States Attorney recommending probation or dismissal of one count of a two

count Indictment when he plead guilty (12/11/78 Tr. at 24) [Agent Gibbs' testimony also established that the United States Attorney in Florida recommended probation when Blanchard plead guilty (12/8/78 Tr. at 40];

(3) Blanchard, at the time he testified at Turner's trial still expected that his cooperation might be communicated to the sentencing judge by the D.E.A.

The Government argues that in none of the cases cited by the Defendant did the witness testify to substantial promises of leniency. The contention is that, *arguendo*, a finding of improper Governmental conduct, Blanchard's testimony, or for that matter the entire record, more than sufficiently establishes the nature and extent of the witness' relationship with the Government. We think this contention goes to the heart of the standard for granting a new trial based upon Governmental misconduct and, therefore, this Court will briefly explore that standard.

## B.

## STANDARD FOR GRANTING NEW TRIAL BASED ON GOVERNMENT MISCONDUCT

### 1.

#### *Giglio*

*Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) established the principle that prosecutors have an affirmative duty to disclose material exculpatory evidence. In *Giglio v. United States*, 405 U.S. 150, 98 S.Ct. 763, 31 L.Ed.2d 104, the Court applied *Brady* to a failure to disclose agreements struck between a witness and the Government, and further found that a new trial was mandated "if 'the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury . . .'" *Giglio v. United States*, 405 U.S. at 154, 92 S.Ct. at 766.

In *Agurs v. United States*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), the Court again addressed the area of the Government's failure to disclose exculpatory evi-

dence. The Sixth Circuit has recently discussed *Agurs* :

The [*Agurs*] Court articulated three different standards for reviewing the materiality of undisclosed information, the applicable standard dependent upon which of three types of factual situations is presented. . . . The first type of factual situation is where the prosecution has employed testimony which the prosecution knew, or should have known, was perjurious. The Court noted at 103, 96 S.Ct. at 2397 that in such a situation the conviction must be reversed "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury."

The second type of situation is exemplified by the *Brady* case wherein the defense makes a specific request for certain evidence. The Court noted at 104, 96 S.Ct. at 2397 that in such a situation "implicit in the requirement of materiality is a concern that the suppressed evidence might have affected the outcome of the trial."

The third type of situation is where, as in *Agurs,* the defense has made no request for exculpatory evidence, or, as in the present case, the defense has made only a general request for exculpatory, or favorable evidence. The Supreme Court noted at 107, 96 S.Ct. at 2399 that there is "no significant difference" between a situation where there has been a general request and one "in which there has been no request at all" . . . . .

The Court further explained the standard of materiality where there has been a general request or no request, stating that a denial of due process will be found only where "the omitted evidence creates a reasonable doubt" as to the defendant's guilt.

*Wagster v. Overberg*, 560 F.2d 735, 739 (6th Cir. 1977).

As implied in *Wagster,* it has been expressly held that *Agurs* does not upset the standard announced in *Giglio* as to due process violations when the Government misconduct goes to nondisclosure of lenien-

cy agreements. *Annuziato v. Manson*, 566 F.2d 410, 414 (2nd Cir. 1977); *United States v. Sutton*, 542 F.2d 1239, 1241–42 (4th Cir. 1976). A direct and simplistic statement of when a new trial is mandated because of a denial of due process under *Giglio* appears in *United States v. Ramos Algarin*, 584 F.2d 562, 564 (1st Cir. 1978):

> This Court has construed *Giglio* to require a two-part showing by one seeking retrial because of an undisclosed plea agreement. *United States v. Bynum*, 567 F.2d 1167 (1st Cir. 1978). First, the Defendant must show that there was a promise of aid made by the Government to a key witness that was not disclosed to the jury. Second, he must demonstrate that, in the language of *Giglio* and *Napue* [*v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959)], "the false testimony could . . in any reasonable likelihood have affected the judgment of the jury . . . ."

The first part of the inquiry relates to whether there has, in fact, been Governmental misconduct and is made without consideration of impact upon the jury. If the Court determines there has been no impropriety, the inquiry ends. If, however, there is a determination that Governmental misconduct was present, the Court then goes to the second part of the test and considers whether a new trial is mandated because there is a reasonable likelihood the false testimony could have affected the judgment of the jury.

█ In view of this analytical method, the Court does not believe that the Government's contention that the undisclosed evidence is cumulative, defeats or impugns the Defendant showing the first part of the test (i. e., showing Government misconduct by nondisclosure of the promises made by Gibbs to Ms. Snow). We think a determination as to whether the Government acted improperly is unrelated to inquiry regarding impact upon jury. There either was an undisclosed agreement or arrangement or there was not. The Government is obliged to disclose all such agreements. We do not have here "discovery" type problems like those involved in *Brady* and *Agurs*. Under

the standards announced by those cases, the prosecutor's duty to disclose is in large part contingent upon the potential impact that such a disclosure would have upon the jury. We feel that failure to disclose to the jury the precise terms of an agreement in existence between a key witness and the Government amounts to Governmental misconduct.

█ Nevertheless, not every instance of Governmental misconduct mandates new trial. If the undisclosed evidence could not, in any reasonable likelihood, have affected the judgment of the jury, then, under *Giglio*, there is no due process violation. *United States v. Ramos Algarin*, 584 F.2d at 565. We think the Government's contention that the undisclosed plea agreement and probation recommendation was cumulative is best construed as a factor to consider in determining whether the second part of *Giglio* has been shown; i. e., whether there is any reasonable likelihood that the jury's judgment was affected by Blanchard's and Gibbs' testimony that, to their knowledge, there were no promises made to Blanchard by the Government. *Campbell v. Reed*, 594 F.2d at 8. Stated in a more affirmative way, the test is whether there is any reasonable likelihood that the jury's judgment would have been affected by disclosure of the promises made by Gibbs to Ms. Snow. *United States v. Ramos Algarin*, 584 F.2d at 465.

█ The Court is of the belief that the jury's judgment as to guilt was not, or would not, be affected. The jurors here were aware of the fact that Blanchard had agreed to cooperate all along, that the Government, through the Florida United States Attorney's Office, had in fact recommended probation when Blanchard plead guilty, and that, at the time of the *Turner* trial, Blanchard still expected that the Government might make favorable suggestions to the sentencing judge if he continued to cooperate. In view of the fact that the jury had this evidence before them, the Court would be hard pressed to find there was any reasonable likelihood their judgment was affected as to Turner being

guilty of all three counts charged by the nondisclosure. Therefore, even though we have found Government misconduct in failure to disclose promises made to Ms. Snow, we are not convinced that there has been a denial of due process under the standard announced in *Giglio*.

### 2.

### Additional Findings

This, however, does not suspend further examination of granting a new trial because of Governmental misconduct. This case has some very disturbing aspects which we feel strike at the core of a system where the Government accuses, investigates and then attempts to prove criminal conduct in a Governmental Court.

We have already found that Agent Gibbs (the Government Agent in charge of Blanchard's case in Florida) did make specific promises to Ms. Snow that, in exchange for the cooperative efforts of Blanchard, he would recommend a maximum of one year imprisonment if a certain individual in Bolivia was not apprehended by the D.E.A. and, alternatively, would recommend probation if that person was apprehended. We also determined that subsequent to the first promises, Agent Gibbs had made a specific promise to Ms. Snow that he would recommend probation because the sought after individual had been apprehended. The Court believes additional findings regarding the testimony of Agent Gibbs is necessary to an illuminated and untarnished administration of justice.

Our findings compel us to conclude, of course, that Agent Gibbs did not disclose to the jury the arrangements he made with Ms. Snow. Moreover, he did nothing to inhibit Blanchard from testifying that there were no such arrangements. We believe this nondisclosure was not the result of negligence or inadvertence. No other conclusion but that of intentional nondisclosure seems reasonable. Agent Gibbs was not merely an agent who helped arrest Blanchard or who had only ancillary contact with the Blanchard case. If his contact with the Blanchard matter was only minimal, then we might have been inclined to find that Gibbs made some passing comment or promise, and through inadvertence, forgetfulness, or negligence forgot that comment or promise at the time of trial. The fact is, Gibbs was the agent in charge of the Blanchard matter. Moreover, he maintained a continued contact with Ms. Snow over several months. From the time of Blanchard's arrest and the Turner trial, only nine months passed, hardly time enough to excuse nondisclosure because of forgetfulness. In making a factual determination, we must say no to any deference that we might otherwise pay to an agent of the Government who has been employed to bring about justice. Gibbs' nondisclosure was intentional. We are further disturbed by two corollary conclusions of fact that flow from this determination.

First, we want to note that in *Giglio* and all the cases cited by the Defendant and the Government, the Governmental conduct related to a situation where (1) the witness testified to the absence of an agreement or promise; (2) someone who was a part of the prosecutorial team (an agent, a member of the prosecutor's staff, or the trial prosecutor himself) did in fact come to some agreement with, or make a promise to, the witness or his counsel regarding leniency; and (3) there was no affirmative act by the Government to correct the false statement that went to the jury. Here something far more distressing occurred. Gibbs not only failed to correct the witness' testimony that, to his knowledge, no promises existed, but he took the stand himself and, under oath, intentionally failed to disclose the promise made to Ms. Snow.

Second, the Court feels it is necessary to examine the following colloquy between the Assistant United States Attorney and Agent Gibbs:

Q. Was there any agreement relative to that exposure to Mr. Blanchard before the charge he plead guilty, if you know?

A. Not to my knowledge, sir.

(12/8/78 Tr. at 25). Unfortunately, we must arrive at the distasteful conclusion that this witness, who is no ordinary witness but rather a Government agent, made a material misrepresentation on the stand. He knew of the arrangements made with Ms. Snow and specifically denied the existence of any agreement regarding exposure. It may be that Gibbs felt he could escape disclosure of the promise by construing the word "agreement" as a Rule 11 plea bargain agreement. However, given the context in which the sentence was asked, such a construction would be entirely unreasonable in the Court's view. This is especially true in light of the witness' experience as an agent and as a witness. Gibbs' misconduct, therefore, is composed not only of the omissive act of nondisclosure but also of affirmative conduct involving, at the least, an intentional misrepresentation made under oath.[1] In view of such findings, we address ourselves to the applicability of two principles of law.

### 3.

#### Butler's Gloss On Giglio

Let us first look to the applicability of one of the cases most strenuously urged upon us by the Defendant. United States v. Butler, 567 F.2d 885 (9th Cir. 1978). That case took a novel, and, this Court believes, a wise approach to Giglio problems. It is novel in two respects.

#### a.

#### Focus Upon Credibility of Witness

First, the Butler Court concluded Giglio language (i. e., that a new trial is mandated only when there is a reasonable likelihood that the judgment of the jury will be affected) focuses upon the quality of the evidence rather than upon outcome of the case.

Under the interpretation of this test set out in the district judge's order, a new trial would be required only if the nondisclosure could reasonably have affected the judgment of the jury to the point of changing its verdict.

This reading of the Giglio language, in effect collapsing the new trial standard into the ordinary one for granting new trials, is the less attractive one. . . .
The proper standard in negligent nondisclosure cases should call for a new trial wherever the nondisclosed evidence might reasonably have affected the jury's judgment of some material point, without necessarily requiring a supplementary finding that it also would have changed its verdict. Giglio's "effect on the judgment of the jury" language seems to focus on the quality of the evidence rather than on the outcome of the case.

This reading is supported by our holding in Flores v. Craven, 503 F.2d 1030 (9th Cir. Sept. 10, 1974), (memorandum for publication), where this court stated that the test under Giglio must be whether the nondisclosure "could have affected the [trier of facts] estimation of credibility."

United States v. Butler, 567 F.2d at 889–90.

Butler requires a new trial when negligent Governmental misconduct (nondisclosure) could have a reasonable likelihood of affecting the judgment of the jury, not as to what the verdict would be, but rather, as to their assessment of the witness' credibility. Most of the other Circuits do not read Giglio so expansively and require a showing to the Court's satisfaction that there be a likelihood the jury's judgment as to guilt or innocence be affected. See, e. g., Campbell v. Reed, 594 F.2d at 8; United States v. Ramos Algarin, 584 F.2d 562, 565 (1st Cir. 1978); United States v. Anderson, 574 F.2d 1347, 1356 (5th Cir. 1978); Boone v. Paderick, 541 F.2d 447, 451–53 (4th Cir. 1976).

We need not resolve the issue of whether to adopt this extreme position of the Ninth Circuit because we do not believe that the jury would have been affected in their assessment of Blanchard's credibility if the

---

1. Although Gibbs' response might not necessarily subject him to the penalties of perjury under 18 U.S.C. § 1621 (1975), see Bronston v. United States, 409 U.S. 352, 93 S.Ct. 595, 34 L.Ed.2d 568 (1973), our determination that there has been Governmental misconduct is not predicated by a finding of perjury. Cf. United States v. Giglio, 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1975); Annuziato v. Manson, 566 F.2d 410, 414 (2nd Cir. 1977).

promise made by Gibbs to Ms. Snow had been disclosed. As indicated above, a great deal regarding Blanchard's relationship with the Government had already been disclosed. Additionally, because we have determined that Gibbs' misconduct was intentional, there are many issues we need not face.[2]

b.

A *Per Se* Rule for Intentional Misconduct

Second, and more importantly, *Butler* expansively interprets, and/or expands upon *Giglio* as creating two different tests for granting a new trial depending upon the degree of culpability of the Government's conduct.

> [O]ur reading of *Giglio*, requiring that [1] negligent nondisclosure situations be assessed as to whether the jury's earlier credibility assessment would have been affected by the newly disclosed evidence, appears a reasonable one. Due process rights would be preserved, yet new trials would not be required in every nondisclosure situation. [2] *In those uncommon cases where prosecutorial misconduct was admitted or virtually uncontroverted, we would preserve an almost per se standard, granting new trials if the suppressed evidence would have been "favorable and material"* to the defense. In the more common case of unintentional nondisclosure, prosecutors would be encour-

aged to disclose their full course of dealings with witnesses under our rule requiring a new trial whenever nondisclosure might have affected the jury's assessment of credibility.

*Id.* at 891 (emphasis added).

Because we have already assessed a new trial would not be mandated under *Butler's* expansive reading of *Giglio*, irrespective of whether we adopt the negligent/intentional distinction, we must address the question of whether to adopt a *per se* standard of granting new trials when "the suppressed evidence would have been 'favorable and material' to the defense."

Let us express at the outset that the Court believes Turner should get a new trial if this standard were adopted. The test is "favorable and material to the defense." The Court takes the words "to the defense" to explicitly exclude Constitutional definitions of "material" or "materiality" used in other contexts.[3] We believe, therefore, that the promises made by Gibbs to Ms. Snow were clearly "material and favorable to the defense" as that phrase is used in *Butler* and explained and defined in Footnote 3, *supra*.

In examining whether to adopt *Butler's* per se type rule, it would be best to first address ourselves to any potential objections to its imposition. Primarily, it could

---

2. Even if we were to adopt the *Butler* position that new trials should be granted *per se* when the nondisclosure of leniency agreements is intentional, we need not necessarily accept *Butler's* focus on the jury's judgment as to credibility of the witness rather than as to guilt or innocence of the Defendant. Similarly, we could reject the *per se* rule by rejecting the intentional/negligent destruction, yet still accept the *Butler* focus upon credibility in its reading of *Giglio*.

3. This conclusion is especially compelling in view of the following: (1) Constitutional materiality had just been exhaustively discussed by the *Butler* Court vis-a-vis negligent misconduct; (2) the Court speaks of "materiality" in the context of announcing a *per se* rule; (3) the source of this negligent/intentional distinction establishing two different tests appears in *United States v. Morell*, 524 F.2d 550, 553 (2nd Cir. 1975). In that case, like this one, the Government disclosed some but not all of the evidence

regarding the Government's relationship with a key witness. The Court said "[F]irst of all, the material was unquestionably favorable to the defense insofar as it bore upon the testimony of Valdez [the cooperating witness]." *Id.* at 554. (4) Additionally, the *Morell* Court, in holding that "intentionally suppressed evidence or ignored evidence [of] high value to the defense could not have escaped his attention, a new trial is warranted if the evidence is merely material or favorable to the defense," cited *United States v. Kahn*, 472 F.2d 272, 287 (2nd Cir.) *cert. denied*, 411 U.S. 982, 93 S.Ct. 2270, 36 L.Ed.2d 958 (1971). That case defined "materiality" as used in this context. The *Kahn* definition of this type of "materiality" appears to have very low threshold. "[T]he materiality of the evidence is measured by the effect of its suppression *upon preparation for trial*, rather than its predicted effect on the jury's verdict." *Id.* (emphasis added).

be argued that *Agurs v. United States*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342, eliminated any method of determining the materiality necessary to precipitate a new trial which varies in inverse proportion to the Government's scienter in suppressing the evidence.

Nor do we believe the constitutional obligation is measured by the moral culpability, or the willfulness, of the prosecutor. If evidence highly probative of innocence is in his file, he should be presumed to recognize its significance even if he has actually overlooked it. *Cf. Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104. Conversely, if evidence actually has no probative significance at all, no purpose would be served by requiring a new trial simply because an inept prosecutor incorrectly believed he was suppressing a fact that would be vital to the defense. If the suppression of evidence results in constitutional error, it is because of the character of the evidence, not the character of the prosecutor.

*Id.* at 110, 96 S.Ct. at 2400–2401. In *Moynahan v. Manson*, 419 F.Supp. 1139, 1147 & n. 21 (D.Conn.1976), the Court said:

Prior to the decision in *Agurs*, the rule in the Second Circuit was the standard of materiality varied with the prosecutor's culpability. *See, e. g., United States v. Morell*, 524 F.2d 550 (2nd Cir. 1975) . . This rule was rejected in *Agurs*, however, in favor of a standard which varies according to the specificity of the request for disclosure.

The Court believes there are two reasons to reject this reading of *Agurs*.

Justice Marshall, in his dissent in *Agurs*, pointed out that *Agurs* did not involve intentional Government misconduct and, therefore, what standard applied when such was present remained an open question. *United States v. Agurs*, 427 U.S. at 121–22 & n. 7, 97 S.Ct. 2392. (Marshall, J., dissenting). It would appear that many courts believe that the question is in fact open because they would continue to utilize a sliding scale as to materiality when the misconduct is negligent or intentional. *See*

*United States v. Butler*, 567 F.2d at 890; *In Re United States*, 565 F.2d 173, 177 & n. 2 (1st Cir. 1977); *Jones v. Jago*, 428 F.Supp. 405, 409 (N.D.Ohio 1977).

The second and more relevant reason for rejecting reading *Agurs* as prohibiting any sliding sale of materiality based upon Governmental scienter, relates to the distinction explicitly recognized in *Agurs* between cases involving perjury or other corruption of truth finding process and those involving "discovery." *See Agurs v. United States*, 427 U.S. at 120–21, 97 S.Ct. 2390 (Marshall, J., dissenting). *Agurs* was a "discovery" case, and did not involve matters relating to undisclosed leniency agreements. *United States v. Sutton*, 542 F.2d 1239, 1241 (4th Cir. 1976). Therefore, even if *Agurs* could be read as abolishing standards varying according to the Government's culpability in "discovery" cases, we do not believe it can be read as abolishing any such distinction as to *Giglio* type circumstances.

■■■■■ We think that the use of a sliding scale is appropriate in *Giglio* situations and, therefore, adopt *Butler*. The Court, depending upon how culpable the Government has been, begins to focus not only upon the impact of the misconduct upon the accused's right but also upon the over-riding concern that our system of adjudicating disputes must always remain free from taint and pollution. In extreme instances of blatant Governmental misconduct, the Court's decision to grant a new trial is not so much predicated upon the accused's rights but upon a desire to prohibit agents of the Government from using the Court to secure desired convictions at any cost.

Furthermore, our cases establish that in cases of deliberate suppression, "prophylactic considerations", designed to deter future prosecutorial misconduct are of overriding importance.

*United States v. Morell*, 524 F.2d 550, 554 (2nd Cir. 1975).

c.

New Trials in the "Interest of Justice" or Supervisory Control

It is unclear whether the *Butler per se* rule was intended to be taken as a constitu-

tional rule or one of supervisory control. However, that is of no import here. We have already concluded that even if there was no finding of a denial of due process, a new trial could be granted if such was necessary "in the interests of justice."

■ Excerpts from the concurring opinion of Judge Ely in *Butler* are particularly relevant and enlightening:

[T]he conduct of the Government here was far below what the American people are entitled to expect from public servants entrusted with such an important aspect of the national interest.

The Government . . . is charged not only with the duty to prosecute the accused, but also with the paramount duty to ensure that justice is done. *United States v. Reynolds*, 345 U.S. 1, 12, 73 S.Ct. 528, 97 L.Ed. 727 (1953); *Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1934). "[T]he interest of the [Government] is not that it shall win the case, but that it shall bring forth the true facts surrounding the commission of the crime so that justice shall be done . . . ." Surely, conduct such as that indulged in here by the Government cannot in any imaginable way promote the just administration of the laws in the United States, and, in fact, affirmatively obstructs the pursuit of justice, the very lofty mission with which the Government is charged. . . .

All federal courts are endowed with certain inherent supervisory powers over the administration of justice in the courts of the United States and must utilize that power, which comprehends the power to dismiss an indictment, whenever the pursuit of truth and justice becomes tainted . . . "The untainted administration of justice is certainly one of the most cherished aspects of our institutions. Its observance is one of our proudest boasts. This Court is charged with supervisory functions in relating to proceedings in the federal courts. (Citation omitted). Therefore, fastidious regard for the administration of justice requires the Court to make certain that the doing of justice

be made so manifest that only irrational or perverse claims of its disregard can be asserted." . . .

I can envision few other situations that would recommend themselves more strongly than this one as candidates for the exercise of a federal court's most exalted powers to deter such prosecutorial tactics. If there is any one characteristic that glorifies our Government, it is the penchant for justice, uniformly and impartially administered. The attainment of justice has ever been the ultimate aim and purpose of honorable men . . .

There is no consideration, including zeal or inexperience, that can affect this transcendent obligation. And if, during a criminal trial and subsequent hearings, federal officers sit quietly acquiescent while one of their witnesses, to their knowledge, repeatedly perjures himself in incriminating the accused, the judicial idealism of our democracy is undermined and subverted.

*United States v. Butler*, 567 F.2d at 893–94 (Ely, J., concurring). In this case, Agent Gibbs not only failed to correct Blanchard's testimony but took the stand and by his own disclosure, buttressed Blanchard's testimony that no agreements or promises existed. Moreover, he made an affirmative material misrepresentation (if he did not outright perjure himself) that no promises or agreements existed. This was an affront to the Court's dignity and honor. It was an affront to the Nation. The Government cannot make its case through the deceptive testimony of its own agents. The Court does not believe that granting a new trial here is subject to criticism analogous to that directed at the exclusionary rule—the criminal goes free because of the constable's blunder. The culpable Governmental conduct was coolly acted out in the very sanctuary of justice, not in the passion of the streets. Accordingly we feel a new trial is essential.

## V. OTHER ALLEGATIONS OF MISCONDUCT

The Court wants to expressly indicate that our holding is in no way contingent

upon whether Mr. Andreoff knew of Gibbs' misconduct. We have not, and need not, make any determination as to that point. Indeed, there is no evidence before us to that effect, and if pressed upon the question, we would be compelled to find that Mr. Andreoff was free of any knowledge of Gibbs' activity.

Similarly, because we believe a new trial is mandated in view of Gibbs' activity, we need not, and do not, reach the issues related to Mr. Andreoff's alleged misconduct or the alleged suppression of portions of Exhibits 4 and 9.

For the foregoing reasons, the Motion filed by the Defendant for a New Trial because of Governmental Misconduct is, and shall be, GRANTED.

James K. Robinson, U. S. Atty., Detroit, Mich., for plaintiff.

Neil H. Fink, Detroit, Mich., for defendant.